EXOTIC COINS, INC., a Colorado corporation d/b/a Westminster Coin & Jewelry, Ltd.; Jeff Anderson d/b/a Westminster Gold and Silver Exchange; John Bielaski d/b/a Gold Dust Coin Center, Plaintiffs-Appellants,

v.

Paul Q. BEACOM in his official capacity as District Attorney for the County of Adams; Bert Johnson in his official capacity as Sheriff for the County of Adams; the City of Federal Heights, an Incorporated Municipality; Lester M. Bauer in his official capacity as Mayor for the City of Federal Heights; Doug Farris in his official capacity as Chief of Police for the City of Federal Heights; the City of Westminster, an Incorporated Municipality; Vi June in her official capacity as Mayor for the City of Westminster; Kenneth Huck in his official capacity as Chief of Police for the City of Westminster; J.D. MacFarlane in his official capacity as Attorney General for the State of Colorado, Defendants-Appellees.

The PEOPLE of the State of Colorado, Plaintiff-Appellant,

v.

Jay David MELTZER, Defendant-Appellee.

Nos. 82SA465, 82SA329.

Supreme Court of Colorado, En Banc.

April 22, 1985.

Rehearing Denied May 28, 1985.

Arthur M. Schwartz, P.C., Arthur M. Schwartz, Kay J. Rice, Irvin Borenstein, Denver, for defendant-appellee in No. 82SA329.

Paul Q. Beacom, Dist. Atty. for Adams County, Steven L. Bernard, Chief Trial Deputy, Brighton, for defendants-appellees in No. 82SA465.

Nolan L. Brown, Dist. Atty., Mary A. Malatesta, Deputy Dist. Atty., Golden, for plaintiff-appellant in No. 82SA329.

Arthur M. Schwartz, P.C., Arthur M. Schwartz, Kay J. Rice, Denver, for plaintiffs-appellants in No. 82SA465.

LOHR, Justice:

These two cases, which we have consolidated for decision, present broad-ranging challenges to the constitutionality of the Purchasers of Valuable Articles Act, §§ 18–16–101 to –110, 8 C.R.S. (1984 Supp.) (the Act). We conclude that the Act can survive each of these assaults on its constitutional sufficiency. Therefore, we affirm the judgment of the Adams County District Court in *Exotic Coins, Inc. v. Beacom*, 82SA465, denying injunctive relief to restrain enforcement of the Act, and reverse the judgment of the Jefferson County District Court in *People v. Meltzer*, 82SA329, dismissing criminal charges for violation of the Act.

The Act was adopted "to aid law enforcement officials in the discovery and identification of sellers of stolen valuable articles and in the identification and recovery of stolen valuable articles by providing a mandatory record-keeping and reporting system by purchasers and by providing a holding period during which time such articles shall not be disposed of or altered in any manner." § 18–16–101, 8 C.R.S. (1984 Supp.). To accomplish these objectives, the Act requires that persons engaged in the business of buying valuable articles, consisting of precious or semiprecious metals or stones, obtain adequate identification from the seller, § 18–16–103, secure a written declaration of the seller's ownership, § 18–16–105(1), keep a register recording detailed information about each purchase,

§ 18–16–105, make the register available to any peace officer for inspection at any reasonable time, § 18–16–105(3), hold certain types of such property in unaltered form for thirty days from the date of purchase, § 18–16–106(1), and permit inspection of the articles by law enforcement officers during the holding period, *id.* Every purchaser must also provide weekly reports to the local law enforcement agency reflecting specified information about each purchase. § 18–16–107. Persons engaged in the business of buying valuable articles may not purchase such an item from any person under the age of eighteen years. § 18–16–104. The Act exempts from its requirements certain transactions by private collectors and certain purchases made exclusively in interstate commerce. § 18–16–109. Violation of the Act is a class 5 felony. § 18–16–108. The Act is set forth in full in Appendix A to this opinion.

I.

The plaintiffs in *Exotic Coins, Inc. v. Beacom* are owners and operators of businesses in Adams County that buy and sell coins having numismatic value, and other articles containing gold, silver and other precious or semiprecious metals or stones. They sought declaratory and injunctive relief to obtain a declaration that the Act is unconstitutional and to restrain the defendant officials from enforcing the Act. The trial court issued a temporary restraining order but, after a later hearing, dissolved that order and denied a preliminary injunction. On July 27, 1982, after trial, the court ruled that the plaintiffs had failed to establish that the Act is unconstitutional, and denied a permanent injunction. The plaintiffs appealed, invoking the jurisdiction of this court because the constitutionality of a statute is in question. *See* § 13–4–102(1)(b), 6 C.R.S. (1973).

In *People v. Meltzer*, the defendant, Jay David Meltzer, was charged with three counts of violation of the Act. Meltzer is a merchant who deals in coins in his Lakewood, Colorado, store. The direct criminal

information alleged that Meltzer purchased gold and silver coins without first securing adequate identification from the seller contrary to the requirements of section 18–16–103, purchased such coins from a person under the age of eighteen in violation of section 18–16–104, and failed to keep a register and record of the purchase of such coins as required by section 18–16–105. The defendant moved to dismiss the charges, asserting that the Act is unconstitutional in several respects. The trial court granted the motion, concluding that the provisions of the Act upon which the charges were based could not be constitutionally applied to the defendant because "the regulation of gold, its possession and transfer has been preempted by the Congress of the United States," with the result that "any attempted regulation by an individual state must fail." The court held that the charge based on the register and record requirements of section 18–16–105 was invalid for the additional reason that the provision allowing peace officers to inspect those records without first obtaining a search warrant contravenes the protections against unreasonable searches and seizures contained in the United States and Colorado constitutions. The People appealed from the judgment of dismissal. Jurisdiction over that appeal is also in this court because the constitutionality of the Act is in question. *See* § 13–4–102(1)(b), 6 C.R.S. (1973).

In *Exotic Coins, Inc.* the appellant coin dealers urge that the Act is unconstitutional because (1) it infringes on the federal government's exclusive jurisdiction over the regulation of currency and gold and silver bullion, *see* U.S. Const. art. I, § 8, cl. 5, the United States Congress has preempted regulation of the subject matter, *see* U.S. Const. art. VI, cl. 2, and it places an impermissible burden on interstate commerce, *see* U.S. Const. art. I, § 8; (2) the inspection of records provisions violate the federal and state constitutional protections against unreasonable searches and seizures, *see* U.S. Const. amend. IV and Colo. Const. art. II, § 7; (3) it is unconstitutionally vague in contravention of U.S. Const. amend. XIV and Colo. Const. art. II, § 25; (4) it purports to establish a felony offense without requiring a culpable mental state, a violation of due process of law, *see* U.S. Const. amend. XIV and Colo. Const. art. II, § 25; (5) the reporting requirements are in conflict with the privilege against self incrimination embodied in U.S. Const. amend. V and Colo. Const. art. II, § 18. In *People v. Meltzer,* the trial court relied on the exclusive federal jurisdiction, preemption, and unreasonable search and seizure grounds in holding unconstitutional the provisions of the Act upon which the charges against Meltzer were based. On appeal, the People direct their argument for reversal to those issues.[1] In this opinion, we sometimes refer to the plaintiffs in *Exotic Coins, Inc.* and the defendant in *People v. Meltzer* collectively as the challengers, or the coin dealers. We also use that same terminology in describing only the plaintiffs in *Exotic Coins, Inc.* where the discussion is limited to that group's contentions.

In *Rathke v. MacFarlane,* 648 P.2d 648 (Colo.1982) we considered the Act for the first time, in the context of an appeal by certain Denver merchants who were engaged in the business of buying and selling precious metals and stones and sought reversal of the denial of a preliminary injunction against enforcement of that statute. The appellants asserted the vagueness, unreasonable search, and federal supremacy arguments that are presented to us again today, and also contended that the Act was unconstitutional for additional reasons not advanced by the parties in the cases now before us. We sustained denial of the preliminary · injunction, affirming the trial court's ruling that the merchants had not

---

1. In this opinion we address only these issues and do not discuss Meltzer's contention, raised for the first time in his answer brief on appeal to this court, that the district court's assumption of jurisdiction after the case had been dismissed by the county court was erroneous. Since this court has not been supplied with the county court record or any record of proceedings in the district court concerning this issue, we are unable to address this question.

demonstrated a reasonable probability of success in their assaults upon the constitutionality of the Act. In so holding we did not discuss the constitutional arguments in detail. To resolve the present cases, however, it is necessary that we do so.

■ We begin with the familiar principle that legislation is presumed to be constitutional and a challenger has the burden of proving invalidity beyond a reasonable doubt. *People v. Alexander*, 663 P.2d 1024 (Colo.1983); *Bollier v. People*, 635 P.2d 543 (Colo.1981); *People in the Interest of C.M. and E.M.*, 630 P.2d 593 (Colo.1981); *People v. Edmonds*, 195 Colo. 358, 578 P.2d 655 (1978); *Flank Oil Co. v. Tennessee Gas Transmission Co.*, 141 Colo. 554, 349 P.2d 1005 (1960). We address the constitutional questions in the order stated above, and conclude that neither the merchants group in *Exotic Coins, Inc.* nor the defendant in *People v. Meltzer* has succeeded in carrying that heavy burden.

## II.

■ The challengers to the Act contend that it intrudes on the exclusive monetary powers of the Congress. Alternatively, they assert that even if state legislation concerning trade in gold and silver coins and bullion were permissible in the absence of congressional legislation, Congress has occupied the field of regulation of that trade, thus preempting that field and foreclosing state legislation such as the Act. These positions are founded on the seminal principle that the laws of the United States are the supreme law of the land, any laws of any state to the contrary notwithstanding. U.S. Const. art. VI, cl. 2. We conclude, however, that the regulations imposed by the Act upon trading in valuable articles do not concern a field of activity either inherently within the exclusive control of the federal government or preempted by congressional action. We also reject the related argument advanced by the coin dealers that the Act violates the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, because the regulation of activities pertaining to the buying, selling and holding of gold is

of such predominant national concern that state regulation is forbidden.

### A.

■ Congress has the power "[t]o coin money, regulate the value thereof, and of foreign coins," U.S. Const. art. I, § 8, cl. 5, and no state shall "coin money; emit bills of credit [or] make anything but gold and silver coin a tender in payment of debts ...," U.S. Const. art. I, § 10, cl. 1. Under Congress' constitutional authority with respect to money, it can create "a currency, uniform in value and description, and convenient and useful for circulation." *Veazie Bank v. Fenno*, 75 U.S. (8 Wall.) 533, 548, 19 L.Ed. 482 (1869); see *Legal Tender Case*, 110 U.S. 421, 445, 4 S.Ct. 122, 28 L.Ed. 204 (1884); *Legal Tender Cases*, 79 U.S. (12 Wall.) 457, 545, 546, 20 L.Ed. 287 (1870). Congress may attach to the ownership of gold and silver "those limitations which public policy may require by reason of their quality as legal tender and as a medium of exchange." *Norman v. Baltimore & O.R.R. Co.*, 294 U.S. 240, 304, 55 S.Ct. 407, 414, 79 L.Ed. 885 (1935). It follows that the states cannot declare what shall be money, or regulate its value. *Id.* at 303, 55 S.Ct. at 414.

■ The Act does not violate these principles. It does not regulate gold and silver coins as currency. Instead, it regulates trade in such coins as articles having value for their metallic content and worth as collectors' items. The regulations impose no constraints on the price to be paid for gold or silver coins or other valuable articles. They simply require that records of transactions be maintained and that certain valuable articles be held by the purchaser for thirty days and be made available to law enforcement officers for inspection during that time. Therefore, the Act's regulation of the purchasing of gold and silver coins does not infringe upon Congress' exclusive power with respect to money. See *Equitable Life Assurance Society v. Grosvenor*, 426 F.Supp. 67, 72 (W.D.Tenn. 1976) (distinction between gold as a commodity and gold as an index of value); *In*

*re Midas Coin Co.,* 264 F.Supp. 193 (E.D. Mo.1967), *aff'd sub nom. Zuke v. St. John's Community Bank,* 387 F.2d 118 (8th Cir.1968) (money as a medium of exchange vs. money as a commodity).

## B.

The coin dealers assert that even if states have the power to legislate on subjects covered by the Act in the absence of congressional action, Congress has preempted the field by its extensive legislative activity. Thus, the challengers argue, under the Supremacy Clause, U.S. Const. art. VI, cl. 2, the Act cannot be sustained.

Although Congress has enacted many provisions concerning gold and silver coins and bullion under its power over the currency and related powers, it has not specifically stated whether states remain free to legislate in the area. To resolve this question, it must be determined whether the scheme of federal regulation is so pervasive that it is reasonable to infer that Congress left no room for the states to supplement it, whether the federal statutes touch a field in which the federal interest is so dominant that the federal system must be assumed to preclude enforcement of state laws on the same subject, and whether enforcement of the state act presents a serious danger of conflict with the administration of the federal program. *Pennsylvania v. Nelson,* 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956); *see Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1946); *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). This requires careful examination of the federal and state laws.

As developed in some detail in *Mid-Fla Coin Exchange, Inc. v. Griffin,* 529 F.Supp. 1006 (M.D.Fla.1981), a case upon which the coin dealers rely, Congress asserted extensive authority over gold by legislation enacted during the Great Depression of the 1930s. Thus, in the Gold Reserve Act of 1934, Pub.L. No. 48-87, 48 Stat. 337; Congress authorized the Secretary of the Treasury to issue regulations prescribing conditions under which gold

could be acquired and held, transported, melted or treated, imported, exported or earmarked. *Id.,* § 3. Any gold withheld, acquired, transported, melted or treated, imported, exported, earmarked, or held in custody in violation of the act or regulations issued thereunder could be seized and condemned. *Id.,* § 4.

In 1973, however, Congress repealed sections 3 and 4 of the Gold Reserve Act of 1934 by Pub.L. 93-110, 87 Stat. 352. As amended a year later by Pub.L. 93-373, 88 Stat. 445, this new legislation, which became effective December 31, 1974, swept away prior laws and regulations prohibiting "any person from purchasing, holding, selling, or otherwise dealing with gold in the United States or abroad." Pub.L. No. 93-110, § 3(b), 87 Stat. 352 (1973). Pub.L. No. 93-110 and Pub.L. No. 93-373 were repealed in 1982 when Congress revised and recodified title 31 of the U.S. Code. Pub.L. No. 97-258, 96 Stat. 877 (1982). *See also Feldman v. Great Northern Railway Co.,* 428 F.Supp. 979 (S.D.N.Y.1977), for a more detailed history of Congressional legislation with respect to gold during the period from the Great Depression forward.

Measuring the presently existing system of federal laws against the Act, we find very little overlap. Both touch upon gold and silver coins. A review of the federal laws relating to gold and silver coins, however, reflects that it is the minting and issuance of such coins and their effect as legal tender that have occupied the continued attention of the Congress. *See, e.g.,* 31 U.S.C. § 5103 (1982) (United States coins are legal tender for debts); 31 U.S.C. § 321(a)(4) (1982) (Treasury Secretary empowered to mint coins); Olympic Commemorative Coin Act, Pub.L. No. 97-220, §§ 2(a)(1), 2(b)(1), 3, 96 Stat. 222 (1982) (authorizing issuance and sale of commemorative gold and silver coins); 31 U.S.C. § 5118(b) (1982) (United States Government may not pay out or deliver gold coin); 31 U.S.C. § 5118(d) (obligations issued prior to October 27, 1977, that require payment in gold or gold coin can be discharged on payment of any legal tender); 31 U.S.C.

§ 5112(e) and (f) (1982) (authorizing the minting of the Eisenhower dollar and Washington half-dollar, each containing silver); 31 U.S.C. § 5120(a) (1982) (obsolete and worn coins withdrawn from circulation shall be melted down).

Other current federal laws concern gold and silver bullion. The Treasury Secretary is empowered to refine, assay and cast bullion, 31 U.S.C. §§ 321(a)(4), 5121 (1982), and there are criminal penalties for falsely marking assayed gold and silver. 15 U.S.C. §§ 291–300 (1976). The Treasury Secretary may also buy and sell gold and silver under certain circumstances. 31 U.S.C. § 5116 (1982). During a national emergency the President may regulate or prohibit the importing, exporting, hoarding, melting or earmarking of gold or silver coin or bullion. 12 U.S.C. § 95a (1945). The Commodity Futures Trading Commission has the power to regulate margin account transactions in gold and silver bulk coins or bullion. 7 U.S.C. § 23(b) (1980).

■ Purchasers of gold or silver coins, who are regulated by the Act, are interested in these coins for their metallic value or value as collectors' items, rather than for their value as currency. We perceive nothing in the federal laws concerning the regulation of gold and silver coins and bullion that reflects pervasive federal regulation of the activities toward which the Act is directed. Nor has there been demonstrated a dominant federal interest precluding enforcement of state laws such as the Act. Enforcement of the Act poses no apparent risk of conflict with the administration of federal laws. Therefore, we conclude that Congress has not preempted the field covered by the Act as it relates to gold and silver coins and bullion. *See Pennsylvania v. Nelson.*

In contending for a contrary result, the challengers rely on *Mid-Fla Coin Exchange, Inc. v. Griffin*, 529 F.Supp. 1006 (M.D.Fla.1981), in which the court concluded that regulation of activities pertaining to the buying, selling and holding of gold by private citizens has always been a matter of national, rather than local, concern.

As a consequence, the court held a Florida statute similar to the Act to be in violation of the Commerce Clause, relying upon the history of congressional legislation from the Great Depression onward and the impact of gold on the national and world economy to demonstrate the validity of its premise of federal primacy. We view that history differently. No matter how extensive congressional occupation of the field of gold and silver ownership and trade may have been while sections 3 and 4 of the Gold Reserve Act of 1934 were in effect, Congress later renounced prohibition of purchasing, holding, selling or otherwise dealing in gold. Pub.L. 93–110, 87 Stat. 352, as amended by Pub.L. 93–373, 88 Stat. 445. Laws enacted since the repeal of these statutes, all of which are codified in title 31 of the U.S. Code, do not restrict private transactions in gold. *See* 31 U.S.C. §§ 5101–5122. Moreover, the narrow scope of regulation effected by the Act does not infringe on national or international monetary policy. We perceive no continuing intention of Congress to preclude state regulation such as the Act, particularly where, as here, strong local interests underlie that regulation. *See Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443, 80 S.Ct. 813, 815–16, 4 L.Ed.2d 852 (1960) (congressional intent to preempt state regulation not to be implied unless fair interpretation of federal legislation requires that conclusion).

The final preemption argument concerns Pub.L. No. 93–373, § 2, 88 Stat. 445 (1974), and Pub.L. No. 93–110, § 3, 87 Stat. 352 (1973), which together provided that no provision of any prior law, rule, regulation, or order "may be construed to prohibit any person from purchasing, holding, selling, or otherwise dealing with gold...." *Id.* The challengers to the Act assert that this provision created an unfettered "right to own and trade gold." The contrary view is that it simply swept aside existing regulation, without precluding future regulation.

We believe that the latter view is correct, for several reasons. First, the statute itself limited its impact to provisions of law

in effect on the date of its enactment. Federal laws regulating certain transactions in gold were subsequently enacted. 7 U.S.C. § 23(b) (1980). Also, Pub.L. No. 93–110 was expressly repealed in 1982, when all related laws of continuing force and effect were recodified in Title 31 of the United States Code. Pub.L. No. 97–258, § 5, 96 Stat. 877, 1081–82 (1982). Finally, the legislative history makes it apparent that this law was directed at specific existing federal regulations originally promulgated pursuant to 12 U.S.C. § 95a (1945). 1974 U.S. Code Cong. & Ad.News 4030; 1973 U.S. Code Cong. & Ad.News 2050. *See Feldman v. Great Northern Ry. Co.*, 428 F.Supp. 979 (S.D.N.Y.1979). We conclude that the Act is not preempted by federal law.

### C.

The coin dealers have also argued that the Act places an impermissible burden on interstate commerce. In support of this assertion, they rely heavily on *Mid-Fla Coin Exchange, Inc. v. Griffin*, 529 F.Supp. 1006 (M.D.Fla.1981). In *Mid-Fla*, the plaintiffs attacked the constitutionality of a Florida statute similar in purpose to the one at hand. The case was before the district court on a motion for preliminary injunction, and the court therefore found it necessary to determine the likelihood that the plaintiffs would prevail on the merits. In doing so, the court found that the act in question was probably unconstitutional, in part because of a provision that required purchasers to retain any purchased item of precious metal for fifteen days following submission of records to law enforcement authorities. This fifteen-day holding requirement was found to disrupt interstate commerce in gold in contravention of national policy. The court in *Mid-Fla* reached this conclusion in part because it found that Public Law 93–373, quoted above, sweeping aside prior laws and regulations preventing the owning or trading of gold, preempted any attempt by the states to regulate gold. Our view, expressed in section II B, that this legislation was not meant to preclude state regulation of the matters covered by the Act compels us to reach a different conclusion.

The Commerce Clause gives Congress the power to regulate commerce among the several states. U.S. Const. art. I, § 8, cl. 3. In the absence of federal legislation, however, states are free to regulate local aspects of interstate commerce. *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851). In absence of congressional action,

> [t]here has ... been left to the states wide scope for the regulation of matters of local state concern, even though it in some measure affects the commerce, provided it does not materially restrict the free flow of commerce across state lines, or interfere with it in matters with respect to which uniformity of regulation is of predominant national concern.

*Southern Pacific Co. v. Arizona*, 325 U.S. 761, 770, 65 S.Ct. 1515, 1521, 89 L.Ed. 1915 (1945). A state law that discriminates against interstate commerce is invalid. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Best & Co., Inc. v. Maxwell*, 311 U.S. 454, 61 S.Ct. 334, 85 L.Ed. 275 (1940); *see Matthews v. Department of Revenue*, 193 Colo. 44, 562 P.2d 415 (1977). Absent congressional preemption, however,

> [w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit*, 362 U.S. 440, 443 [80 S.Ct. 813, 815–16, 4 L.Ed.2d 852] [1960]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

In determining whether state regulation has been preempted by federal action, "the intent to supersede the exercise by the State of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the State."

*Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443, 80 S.Ct. 813, 815–16, 4 L.Ed.2d 852 (1960), quoting from *Savage v. Jones*, 225 U.S. 501, 533, 32 S.Ct. 715, 725, 56 L.Ed. 1182 (1912).

The court in *Mid-Fla* found the statute before it defective primarily because it concluded that gold regulation was an area of national concern already regulated by the federal government. We noted earlier, however, that although federal regulation of currency is pervasive, the Colorado Act concerns regulation of gold and silver coins not as currency but as valuable articles, and hence it does not occupy an area where there is a predominant federal interest in uniformity of regulation.

■ Turning to the issue of impeding the free flow of commerce, Colorado's statute differs significantly from the Florida regulation at issue in *Mid-Fla*. The Florida law required that any articles containing precious metals be held for fifteen days before being removed from the county. In contrast, section 18–16–106(2), 8 C.R.S. (1984 Supp.), provides that "[s]tamped and assayed gold and silver bullion and gold coins shall not be subject to the holding requirement imposed by subsection (1) of this section." This difference is significant, because while there is no uniform federal regulation of trade in gold or silver coin or metal as commodities, there is some federal regulation of transactions in gold and silver bullion. *See*, 31 U.S.C. §§ 321(a)(4), 5116, 5121 (1982); 7 U.S.C. § 23(b) (1980); 12 U.S.C. § 95a (1945). As noted earlier, regulation by the federal government in this narrow area is not per-

vasive and there is no evidence of a necessity for a uniform federal scheme, but by exempting gold coin and gold and silver bullion from the requirements of the holding period, the Colorado law avoids even the possibility of infringing on interstate commerce in an area in which Congress has expressed an interest, and minimizes any imposition on the free flow of commerce.

In addition, the Act is a legitimate exercise of the state's police power designed to protect citizens by facilitating the recovery of stolen valuables and the apprehension of thieves. It is not a discriminatory statute. Its applicability is limited to persons doing business as purchasers of valuable articles in Colorado. The casual collector is not subject to the Act's requirements. §§ 18–16–102(5), 18–16–109, 8 C.R.S. (1984 Supp.). Moreover, the Act expressly provides that it shall not apply "to valuable articles purchased exclusively in interstate commerce and paid for by check mailed to the seller in another state...." § 18–16–109, 8 C.R.S. (1984 Supp.). We conclude that the Act "regulates even-handedly to effectuate a legitimate local interest," the state interest is weighty, "[the Act's] effects on interstate commerce are only incidental," and it has been designed to minimize its effects on interstate commerce. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

Accordingly, we hold that the Act does not violate the Commerce Clause of the United States Constitution.

## III.

### A.

The Act contains a number of provisions requiring that purchasers of valuable articles maintain records of transactions and allow those records and the purchased articles to be inspected by law enforcement officers. The merchant appellants in *Exotic Coins, Inc.* challenge all of these requirements as inconsistent with constitutional protections against unreasonable searches and seizures. *See* U.S. Const. amends. IV, XIV; Colo. Const. art. II, § 7.

Defendant Meltzer supports the district court's ruling that the record keeping requirements of section 18–16–105 under which he was charged are invalid for the same reasons.

The Act requires that a purchaser of valuable articles keep a register recording the name, address, date of birth and identification number of the seller; the date, time and place of purchase; and an accurate and detailed account and description of each valuable article purchased. § 18–16–105(1), 8 C.R.S. (1984 Supp.). The purchaser must also obtain a written declaration of the seller's ownership. *Id.* The register shall be made available "to any peace officer for inspection at any reasonable time," § 18–16–105(3), and any law enforcement officer may also inspect valuable articles in the thirty-day period following purchase during which purchasers are required to hold such articles unaltered in form. § 18–16–106(1). This holding period does not apply to stamped and assayed gold and silver bullion and gold coins; instead, the purchaser must record the identity of the person to whom he transfers such items, and the date, time and place of transfer. § 18–16–106(2). Purchasers are required to provide to the local law enforcement agency on a weekly basis records of valuable articles purchased during the preceding week and a copy of the seller's declaration of ownership. § 18–16–107(1). A copy of these documents must also be forwarded to the local law enforcement agency having jurisdiction in the area where the seller resides. § 18–16–107(2).

Under the Act, an officer may examine the register at any reasonable time and may also inspect valuable articles during the holding period. The Act does not require that the officer obtain a subpoena or a warrant before conducting these searches. The United States Supreme Court has explained the protections provided by administrative subpoena and search warrant requirements. "[T]he Fourth Amendment requires that [an administra-

tive] subpoena [for books or records] be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.... [T]he subpoenaed party may obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply." *See v. City of Seattle,* 387 U.S. 541, 544–45, 87 S.Ct. 1737, 1739–40, 18 L.Ed.2d 943 (1967); *see Pignatiello v. District Court,* 659 P.2d 683 (Colo. 1983); *Charnes v. DiGiacomo,* 200 Colo. 94, 612 P.2d 1117 (1980). A warrant "provide[s] assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria ... [and] advise[s] the owner of the scope and objects of the search...." *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 323, 98 S.Ct. 1816, 1826, 56 L.Ed.2d 305 (1978).[2] The coin dealers assert that an administrative search conducted without one of these safeguards violates the constitutional guarantees against unreasonable searches and seizures.

The challengers again place reliance on *Mid-Fla Coin Exchange, Inc. v. Griffin,* 529 F.Supp. 1006 (M.D.Fla.1981). In that case the court tested a Florida statute closely similar to the Act and concluded that, whether analyzed under the administrative subpoena cases or the warrantless administrative inspections authorities, the statutorily-authorized inspection of records and articles purchased was contrary to the Fourth Amendment. The court concluded that absence of standards concerning the businesses to be selected for search and the frequency of searches, the broad scope of permissible searches in relation to their legitimate purpose, and the absence of provisions for judicial screening in advance of search were fatal to the statute.

We conclude that a careful reading of the United States Supreme Court decision in *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), a

---

**2.** These assurances are sufficient to satisfy the warrant clause of the Fourth Amendment. *Ca-*

*mara v. Municipal Court,* 387 U.S. 523, 534–39, 87 S.Ct. 1727, 1733–36, 18 L.Ed.2d 930 (1967).

case that was not discussed in *Mid-Fla,* resolves this issue in favor of the constitutional sufficiency of the Act. In *Donovan,* the Court held that the Secretary of Labor could obtain an injunction against a quarry owner requiring the owner to permit warrantless searches of the quarry to ensure compliance with the Federal Mine Safety and Health Act of 1977. *Id.* at 596–97, 606, 101 S.Ct. 2534, 2542.

The Court noted that the Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial property. However, while administrative searches of private homes must ordinarily be conducted pursuant to a warrant, *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment. *Donovan v. Dewey,* 452 U.S. at 598, 101 S.Ct. at 2537. This greater latitude "reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home...." *Id.* at 598–99, 101 S.Ct. at 2537–38. The Fourth Amendment protects the owner of commercial property from unreasonable intrusions by agents of the government. Inspections of commercial property may be unreasonable if they are not authorized by law, are unnecessary for the furtherance of government interests, or are so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will be inspected from time to time by government officials. *Id.* at 599, 101 S.Ct. at 2538. Where the legislature has made no rules governing the procedures that inspectors must follow, a warrant may be necessary to protect the owner from the unbridled discretion of executive and administrative officers. *Id.*

The assurance of regularity provided by a warrant may not be required when the legislature has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the regulatory presence is "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Id.* at 600, 101 S.Ct. at 2538–39. Thus, in *Donovan,* periodic warrantless inspections of mines to ensure compliance with mine health and safety standards were upheld; in *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), unannounced, warrantless inspections of the premises of firearms and ammunition dealers to examine required records and stock were upheld; and in *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), the congressional scheme for warrantless inspection of the records and inventory of a liquor dealer was sustained against a Fourth Amendment challenge. Where those standards are not met, warrantless administrative searches cannot be constitutionally sustained. *Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (warrantless search of any employment facility for safety hazards, under Occupational Safety and Health Act of 1970, unconstitutional); *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) (warrantless search of commercial warehouse under fire code to ascertain fire hazards unconstitutional), *cf. Michigan v. Clifford,* 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) (search of burned home to determine cause of blaze after fire-fighting efforts have been completed requires a warrant); *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (search of burned furniture store to ascertain cause of fire after firefighters have completed their work requires a warrant).

It is not asserted by the challengers that the searches at issue here are unauthorized by law or unnecessary for the furtherance of governmental interests. The legislature has determined that illicit traffic in stolen valuable articles is encouraged by the absence of any required record-keeping system by the purchasers of those articles.

§ 18–16–101, 8 C.R.S. (1984 Supp.) (legislative declaration). The defendant officials presented a great deal of evidence in *Exotic Coins, Inc.* relating regulation of the purchasing of valuable articles to recovery of stolen valuable articles and the identification of those who took them. The contested issue is whether the regulatory presence is sufficiently comprehensive and defined to bring searches under the Act within those "certain carefully defined classes of cases," *Camara v. Municipal Court,* 387 U.S. at 528, 87 S.Ct. at 1730, where the *Colonnade—Biswell—Donovan* exception allows warrantless searches. We hold that it is.

The Act requires a purchaser of valuable articles to identify the seller, obtain a declaration of ownership, keep a register of transactions, hold most types of valuable articles for thirty days, and report transactions and submit declarations of ownership on a weekly basis. § 18–16–103, –105 to –107, 8 C.R.S. (1984 Supp.). A purchaser of valuable articles is necessarily aware that the register of transactions will be subject to periodic inspections because it is the Act that requires the buyer to maintain the register in the first place and to make weekly reports on the information it contains. The scope of this search is limited to the register itself, the purposes of the search are apparent from the required contents of the register and from the weekly reporting requirement, and the search can be made only at a "reasonable" time. When viewed as an adjunct to the weekly reporting requirement, inspection of the register is unlikely to be so random, infrequent or unpredictable that a legitimate expectation of privacy in its contents will arise. *See Donovan v. Dewey,* 452 U.S. at 598–99, 101 S.Ct. at 2537–38.

With regard to inspection of valuable articles during the holding period, the purchaser is again necessarily aware that these articles will be subject to periodic inspection, because the holding period would serve little, if any, purpose if these articles could not be readily inspected. The scope of the search is limited to the items held. If these items were not held separate, then—at least in the case of dealers— the valuable articles would be merchandise offered for sale, and the purchaser's expectation of privacy in such merchandise ordinarily would be minimal. *See Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) (Even objects in a person's home might not be protected by the Fourth Amendment if they are exposed to the plain view of outsiders with no intention to keep them private.).

The Act's challengers argue that the *Colonnade—Biswell—Donovan* exception to the warrant requirement is inapplicable for several reasons. First they claim that warrantless administrative searches are reasonable only in industries with a "long tradition of close government supervision," *Marshall v. Barlow's Inc.,* 436 U.S. at 313, 98 S.Ct. at 1820. This position was rejected in *Donovan v. Dewey,* 452 U.S. at 606, 101 S.Ct. at 2542, where it was held that the pervasiveness and regularity of regulation, not its duration, determines whether a warrantless inspection program is reasonable under the Fourth Amendment.

Another asserted objection is that these searches are made without probable cause. Although this concern was raised in *Camara v. Municipal Court,* 387 U.S. at 534–39, 87 S.Ct. at 1733–36, that case involved the search of a private residence. The appellants in *Camara* argued that the Fourth Amendment requirement that "no warrants shall issue, but upon probable cause," was applicable to administrative housing inspections. The Court in *Donovan,* however, noted that the warrant requirement of the Fourth Amendment is not necessarily applicable to administrative searches of commercial property. *Donovan v. Dewey,* 452 U.S. at 598, 101 S.Ct. at 2537. The Court thus had no occasion to address the issue of probable cause. Nor is it necessary for this court to consider the issue, since we find that the Act authorizes a warrantless administrative search that is valid under the *Donovan* standard.

Finally, the coin dealers suggest that the *Colonnade—Biswell—Donovan* exception does not apply where the purpose of the search is to obtain evidence of crime rather than to further administrative or regulatory objectives. It is true that the legislative intent was "to aid law enforcement officials in the discovery and identification of sellers of stolen valuable articles and in the identification and recovery of stolen valuable articles...." § 18–16–101. The method of accomplishment of this objective, however, *is* the implementation of an administrative and regulatory scheme of record keeping and inspection. The searches conducted under the Act are not directed toward gathering evidence concerning a single particular crime. *Compare* this case *with Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) (search of burned home to determine cause of fire or to obtain evidence of arson). Rather, the administrative searches permit systematic gathering of information that, together with other data gleaned by law enforcement officers through their regular activities in investigating thefts, will enable thieves to be identified and stolen property to be recovered. It is also noteworthy that there is nothing in the Act to suggest that purchasers of valuable articles are targeted as a group suspected of criminal activity. The possibility that searches under the Act could lead to discovery of criminal activity by a purchaser seems no more direct than that the administrative searches authorized by *Colonnade, Biswell* and *Donovan* might yield evidence of violation of criminal laws by the liquor dealers, firearms and ammunitions merchants, or mine owners involved in those cases. Given the totality of these circumstances, we reject the contention that the searches authorized by the Act are constitutionally flawed because of their purpose.

The challengers to the Act refer to the search and seizure clause of the Colorado Constitution, Article II, section 7, without suggesting that a different standard of reasonableness should be applied. We see no reason to reach a different result here under the Colorado Constitution than that reached under the United States Constitution.

We conclude that the register and valuable article search provisions of the Act do not constitute constitutionally unreasonable searches.

### IV.

 The plaintiffs in *Exotic Coins* vigorously argue that several provisions of the Act are unconstitutionally vague. Two closely-related due process principles provide the grounds for such an attack. A statute is void for vagueness if it does not give fair warning of the conduct prohibited or if its standards are so ill-defined as to create a danger of arbitrary and capricious enforcement. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *LDS, Inc. v. Healy*, 197 Colo. 19, 589 P.2d 490 (1979). In analyzing a penal statute for vagueness, we use a well-established test: if the statute fairly describes the conduct forbidden, and men of common intelligence can readily understand its meaning and application, it will be upheld. *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *People v. Blue*, 190 Colo. 95, 544 P.2d 385 (1975); *People v. Gonzales*, 188 Colo. 272, 534 P.2d 626 (1975).

### A.

 The coin dealers argue that the terms "valuable article," "purchaser," "private collector," "collectors' items," "stamped and assayed gold and silver bullion," and "law enforcement officer" are inadequately defined. Statutory terms need not be defined with mathematical precision in order to be valid. Rather, statutory language must strike a balance between two conflicting concerns; it must be specific enough to give fair warning, yet sufficiently general to address the problem under varied circumstances and during changing times. *Colorado Auto & Truck Wreckers Association v. Department of Revenue*, 618 P.2d 646, 651 (Colo.1980).

Moreover, if the legislative intent is clear, imprecision of terms does not necessarily result in constitutional deficiency. *See LDS, Inc. v. Healy,* 197 Colo. 19, 589 P.2d 490 (1979). "[A] statute need not be drafted with the greatest possible facility or lucidity of expression if it meets the minimal requirements of due process." *People v. Blue,* 190 Colo. at 100, 544 P.2d at 389.

■■■ Analyzing the Act in this light leads to the conclusion that the term "valuable article" is not impermissibly vague. The general legislative purpose in adopting the Act could not be more clearly expressed. Section 18–16–101, 8 C.R.S. (1984 Supp.), states:

> The general assembly hereby finds and determines that illicit traffic in stolen valuable articles is encouraged by the absence of any required record-keeping system by persons purchasing such valuable articles.... [i]t is the intent of the general assembly, by enacting this article, to aid law enforcement officials in the discovery and identification of sellers of stolen valuable articles and in the identification and recovery of stolen valuable articles by providing a mandatory record-keeping and reporting system....

The Act also contains a definitional section in which "valuable article" is defined as:

> any tangible personal property consisting, in whole or in part, of precious or semiprecious metals or stones, whether solid, plated, or overlaid, including, but not limited to, household goods, jewelry, United States commemorative medals or tokens, and gold and silver bullion.

§ 18–16–102(7)(a), 8 C.R.S. (1984 Supp.).[3]

■■■ The challengers object particularly to the phrase "including, but not limited to," appearing in section 18–16–102(7)(a). They fear that this wording allows law enforcement officials to make ad hoc determinations as to what is "valuable," and that it is therefore impossible to determine in advance what will fall within that category. A careful reading of this section, however, reveals that, in order to be considered a valuable article, an item must be composed in whole or in part of precious or semiprecious metals or stones. Thus, "valuable" is not a term left to subjective interpretation. Any tangible personal property made of precious or semiprecious metals or stones is a valuable article for the purposes of the Act. That a close reading is required in order to understand the statute does not render it invalid, *People v. Blue,* 190 Colo. at 101, 544 P.2d at 389, nor is it fatal that the definition mentions some, but not all, of the items made of such materials, *cf. id.*

The coin dealers have also objected to the Act's definitions of precious or semiprecious metals or stones. Section 18–16–102(3) defines these terms as follows:

> "Precious or semiprecious metals or stones" means such metals as, but not limited to, gold, silver, platinum, and pewter and such stones as, but not limited to, alexandrite, diamonds, emeralds, garnets, opals, rubies, sapphires, and topaz. For the purposes of this article, ivory, coral, pearls, jade, and such other minerals, stones, or gems as are customarily regarded as precious or semiprecious are deemed to be precious or semiprecious stones.

Here again, the Act has listed examples without limiting the definition to those examples alone. This is not, as appellants suggest, a vague definition. Rather, it is one that remains flexible to meet the needs of changing times. *See Colorado Auto & Truck Wreckers Association v. Department of Revenue,* 618 P.2d at 651. What is considered precious may depend on fluctuations in a worldwide market; the Act is drafted to accommodate any changes that occur.

Furthermore, although "precious" and "semiprecious" are terms of common us-

---

**3.** Section 18–16–102(7)(b), 8 C.R.S. (1984 Supp.), expands the definition of "valuable article" to encompass "foreign currency when purchased for more than its face value or foreign currency exchange value." No vagueness challenge is leveled at this part of the definition of "valuable article."

age, even Webster's Dictionary gives less than an exact definition.

> *Precious stone.* Diamonds, rubies, sapphires, and emeralds are always ranked as precious stones; sometimes others, as alexandrites and cat's-eyes, are included. The pearl, although not a stone, is ranked as a precious gem because of its beauty and rarity.

*Merriam Webster's New International Dictionary* (2d ed. 1959). Surely statutory terms can be only as precise as the language in which they are written. That the coin dealers can contemplate additional examples does not render the definition constitutionally invalid on its face.

### B.

The coin dealers' argument that "purchaser" is a vague term is tied to their contention that "valuable article" is unconstitutionally vague. The Act states that a purchaser is:

> any person holding himself out to the public as being engaged in the business of buying valuable articles or any person who purchases five or more valuable articles during any thirty-day period. "Purchaser" does not include a person purchasing valuable articles from an estate or from a retail or wholesale merchant.

§ 18–16–102(5), 8 C.R.S. (1984 Supp.).

Since we have concluded that the term "valuable article" is not vague, use of that term in the definition of "purchaser" does not render that latter definition invalid. The challengers argue, however, that the definition is vague because it is unclear how recently five purchases must have been made to make a buyer a "purchaser." They also challenge the fact that no definition is given for the terms "estate" or "retail or wholesale merchant."

The clear purpose of defining "purchaser" as the Act does is to restrict the Act's application to exclude casual collectors of valuable articles. *See* § 18–16–109, 8 C.R.S. (1984 Supp.). Only commercial dealers and other frequent buyers are meant to be subject to the reporting requirements. In order to achieve this objective, the Act

excludes from the definition of "purchaser" someone who makes only a few purchases a month, and someone who buys valuable articles from an estate. Moreover, the legislature concluded that the purposes of the Act would not be advanced by extending its coverage to a person purchasing valuable articles from a retail or wholesale merchant. As in all definitions in the Act, not every word is separately defined, but this court has never held that such specificity is necessary. *People v. Blue,* 190 Colo. 95, 544 P.2d 385 (1975). When considered as a whole, the definition of "purchaser"—including its utilization of the readily comprehensible terms "estate" and "retail or wholesale merchant"—when read together with section 18–16–109, makes clear the scope of the Act's applicability, provides guidance for law-abiding behavior, and does not create a danger of arbitrary enforcement. *See People v. Beruman,* 638 P.2d 789 (Colo.1982).

The challengers contend that the inclusion of all persons purchasing five valuable articles in one month within the definition of "purchaser" makes that definition vague because it may be applied to persons who made such purchases many years ago. This objection is also untenable. Statutes are presumed to operate prospectively, § 2–4–202, 1B C.R.S. (1980), and there is nothing in the Act to suggest that it is meant to encompass acts that took place before the statute was drafted. In view of this it is clear that only a person who has made five or more purchases of valuable articles in a thirty-day period since the enactment of the Purchasers of Valuable Articles Act may be considered a "purchaser" for the purposes of enforcing the Act.

### C.

The Act includes "gold and silver bullion" within the definition of "valuable article," § 18–16–102(7), and exempts "stamped and assayed gold and silver bullion" from the thirty-day holding requirement, § 18–16–106. The challengers argue that "bullion" is vague, based on conflict-

ing testimony elicited by them from several witnesses. Nevertheless, the fact that the witnesses did not know the definition of the word "bullion" does not compel the conclusion that it has no sufficiently definite meaning. Webster's Dictionary defines bullion as:

> Gold or silver, considered merely as so much metal without regard to any value imparted by its form ... specif., uncoined gold or silver, in the shape of bars, ingots, or the like.

*Merriam Webster's New International Dictionary* (2d ed. 1959). Nor is the expanded term "assayed ... bullion" insufficiently definite. To assay is to examine to determine the metal's weight, measure, quality or other properties. *Id.*

▪ The coin dealers argue that, because jewelry might be considered bullion, it is impossible to know whether it is subject to the Act's holding period. Under the terms of section 18–16–106, however, there is little reason for such confusion to occur. Section 18–16–106 states that, although valuable articles other than gold and silver bullion shall be subject to the holding period, bullion shall not. Jewelry is included within the Act's definition of valuable articles; therefore, jewelry is subject to the holding period, while gold and silver valuable for metallic content only would not be. The fact that situations can be envisioned in which difficulty in application of these definitions can be expected does not render the definitions impermissibly vague. *People v. Blue*, 190 Colo. at 101, 544 P.2d at 389.

### D.

▪ We turn next to a portion of the Act that excludes from the Act's application valuable articles "purchased exclusively in interstate commerce and paid for by check mailed to the seller in another state," provided that certain limited records of the transaction are maintained. § 18–16–109, 8 C.R.S. (1984 Supp.). This exclusion, the challengers to the Act contend, is unconstitutionally vague because it might be construed to cover items obtained by a purchaser that were at some earlier time imported from another state. This is a strained construction that defies the clear language of the provision. The legislative intent was to create a narrow exemption for qualified, isolated transactions involving interstate commerce. We conclude that the exemption applies only when the purchaser mails a check to a seller in another state and that the coin dealers' interpretation is untenable.

A similar argument is made by the challengers with respect to the exemption for "businesses engaged in selling valuable articles exclusively as collectors' items, and who pay for such purchases by check." § 18–16–109, 8 C.R.S. (1984 Supp.). Once again the coin dealers argue for a construction that strains the plain meaning of the provision. Within the challenged section, a collector's item is considered an article valued for its artistic or historical worth, rather than for the market price of its metallic or stone content. We find no merit in the coin dealers' argument that this is confusing, or in their contention that anyone selling any valuable articles as collectors' items should fit within the exemption even though they also sell valuable articles for their metallic value. Such a construction would have the effect of rendering the word "exclusively," in the above-quoted section, meaningless. Such a construction defies common sense, as well as common English usage.

### E.

The coin dealers' final vagueness challenge concerns the terms "law enforcement agency" and "peace officer," which are defined by the Act as follows:

> "Local law enforcement agency" means any marshal's office, police department, or sheriff's office with jurisdiction in the locality in which the purchaser makes the purchase.

§ 18–16–102(1), 8 C.R.S. (1984 Supp.).

> "Peace officer" means any undersheriff, deputy sheriff other than one appointed with authority only to receive and serve summons and civil process, police officer,

state patrol officer, town marshal, or investigator for a district attorney or the attorney general who is engaged in full-time employment by the state, a city, city and county, town, judicial district, or county within this state.

§ 18–16–102(2), 8 C.R.S. (1984 Supp.).

Unlike other terms defined by the Act, there is no language here suggesting that these definitions are not limited to the officials described. In light of this, the challengers' contention that it is unclear which officers are included in these definitions is without merit.

### V.

We next address the coin dealers' challenge to the penalty provision of the Act, § 18–16–108, 8 C.R.S. (1984 Supp.), which states:

> Any person who violates any of the provisions of this article commits a class 5 felony. Any person who knowingly gives false information with respect to the information required by sections 18–16–103 and 18–16–105 commits a class 5 felony.

The challengers contend that the first sentence of this section creates a strict liability offense for failure to keep records as required. Relying on *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228, *reh. denied*, 355 U.S. 937, 78 S.Ct. 410, 2 L.Ed.2d 419 (1958), they argue that a statute that makes a felony of a wholly passive failure to act is unconstitutional. *Lambert* held that an ordinance making it unlawful for persons convicted of felonies to remain in Los Angeles for more than five days without registering violated due process of law in the absence of a requirement that the violator had actual knowledge of the duty to register, or that proof be made of the probability of such knowledge. 355 U.S. at 229, 78 S.Ct. at 243.

We believe that *Lambert* is distinguishable from the case at hand. In *Lambert*, the Court noted that the statute at issue was unlike the usual exercise of police power creating an offense based on a failure to perform a required act. Mere presence in the city was sufficient to trigger operation of the act, and there was nothing to alert persons subject to the registration requirement that action was required. In finding the ordinance in *Lambert* unconstitutional, the Court did not completely abrogate the states' rights to "declare an offense and to exclude elements of knowledge and diligence from its definition." 355 U.S. at 228, 78 S.Ct. at 242. Nevertheless, the United States Supreme Court has suggested that strict liability offenses traditionally have not been favored in Anglo-American criminal jurisprudence, and at least where a crime has its origin in the common law, a culpable mental state requirement will be presumed to have been intended by Congress even in the absence of explicit statutory language. *United States v. United States Gypsum Co.*, 438 U.S. 422, 436–38, 98 S.Ct. 2864, 2873–74, 57 L.Ed.2d 854 (1978); *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). We have interpreted our own criminal statutes in like manner. *People v. Mascarenas*, 666 P.2d 101, 107 (Colo.1983).

The legislative purpose of the Purchasers of Valuable Articles Act is to reduce the frequency of burglaries and allow stolen goods to be returned to the rightful owners by requiring purchasers of valuable articles to keep records and hold goods for a certain period before resale. This court has held before, under similar circumstances, that it will not be presumed that the legislature intended to attach serious criminal penalties to an act or omission requiring no culpable mental state. *People v. Sequin*, 199 Colo. 381, 609 P.2d 622 (Colo.1980); *see People v. Washburn*, 197 Colo. 419, 593 P.2d 962 (Colo.1979); *People v. Johnson*, 193 Colo. 199, 564 P.2d 116 (1977). Legislative silence on the element of intent is not to be construed as an indication that no culpable mental state is required. *People v. Moore*, 674 P.2d 354, 358 (Colo.1984); *People v. Hart*, 658 P.2d 857, 859 (Colo.1983); *People v. Bridges*, 620 P.2d 1, 3 (Colo.1980). And where a statute is susceptible of different constructions,

only one of which complies with constitutional requirements, the constitutional construction must be adopted. *People v. Alexander*, 663 P.2d 1024, 1027 (Colo.1983); *People ex rel. City of Arvada v. Nissen*, 650 P.2d 547, 550 (Colo.1982); *People v. Smith*, 638 P.2d 1, 3 (Colo.1981); *People v. Sequin*, 199 Colo. at 386, 609 P.2d at 625.

■■■ The second sentence of the provision in question clearly requires a "knowing" violation. Consistent with the foregoing principles, we conclude that this applies to the first sentence as well. Therefore, the premise upon which the challengers base their attack on section 18–16–108 —that it creates a strict liability offense— is invalid.

## VI.

The final constitutional challenge to the Act concerns its reporting requirements. The challengers argue that requiring purchasers of valuable articles to keep a register of their transactions, § 18–16–105(1), 8 C.R.S. (1984 Supp.), to make the register available for inspection by peace officers, § 18–16–105(3), and to make weekly reports to the local law enforcement agency, § 18–16–107, constitutes a violation of their Fifth Amendment privileges against self-incrimination.

Analysis of this issue is guided by the United States Supreme Court's decisions in *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). In *Shapiro*, the Court approved the "required records" doctrine previously adopted by several state supreme courts. According to that doctrine, records kept by requirement of law to provide information concerning transactions subject to legitimate government regulation are maintained for the benefit of the public, and should be open to public inspection.[4] The Court discerned a constitutional difference between public and private papers. No Fifth Amendment right could be asserted in the contents of public papers. Thus, no such right could be asserted in sales records maintained by a merchant pursuant to regulations promulgated under the Emergency Price Control Act.

This doctrine was limited by *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). *Marchetti* involved a statutory system for taxing wagers. Persons involved in the illegal activity of wagering were required to register with the Internal Revenue Service, post registration stamps "conspicuously," and pay an occupational tax. The register was made available to law enforcement officers. In evaluating this scheme, the United States Supreme Court found *Shapiro* inapplicable. The result of the *Marchetti* reporting system was direct incrimination of the person making the report. The court found the three elements of the *Shapiro* "required records" doctrine missing in *Marchetti*: the records were not the kind Marchetti would usually have kept, there were no public aspects to Marchetti's records, and whereas the requirements in *Shapiro* were directed at a non-criminal, regulatory area of the law, those in *Marchetti* were directed at a group "inherently suspect of criminal activities." 390 U.S. at 57, 88 S.Ct. at 707. *Accord Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968); *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); *Albertson v. SACB*, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965).

---

4. The court assumed "that there are limits which the Government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself." 335 U.S. at 32, 68 S.Ct. at 1391. It concluded, however, that "no serious misgiving that those bounds have been overstepped would appear to be evoked when there is a sufficient relation between the activity sought to be regulated and the public concern so that the Government can constitutionally regulate or forbid the basic activity concerned, and can constitutionally require the keeping of particular records subject to inspection...." *Shapiro v. United States*, 335 U.S. at 32, 68 S.Ct. at 1391.

The appellants argue that the case at hand is similar to *Marchetti*. We disagree. *Marchetti* was not the last word on the incrimination issue. The United States Supreme Court has since held in *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), that although many kinds of reporting may raise a possibility of prosecution derived from information in the reports, the mere possibility of incrimination is insufficient to defeat strong policies in favor of disclosure. The court in *Byers* upheld a statutory requirement that motorists who have been involved in accidents must stop at the scene and give their names and addresses. In resolving the self incrimination issue, the Court stated:

Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one. Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly.

An organized society imposes many burdens on its constituents. It commands the filing of tax returns for income; it requires producers and distributors of consumer goods to file informational reports on the manufacturing process and the content of products, on the wages, hours, and working conditions of employees. Those who borrow money on the public market or issue securities for sale to the public must file various information reports; industries must report periodically the volume and content of pollutants discharged into our waters and atmosphere. Comparable examples are legion.

In each of these situations there is some possibility of prosecution—often a very real one—for criminal offenses disclosed by or deriving from the information that the law compels a person to supply. Information revealed by these reports could well be "a link in the chain" of evidence leading to prosecution and conviction. But under our holdings the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here.

*California v. Byers*, 402 U.S. at 427–28, 91 S.Ct. at 1537–38. (Footnote omitted.) *See United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927).[5]

■ The *Shapiro-Byers* rationale is controlling in this case. Although all the records required by the Act may not be the kind normally kept by a purchaser in the course of business, neither are they highly private or inherently incriminating. The registration and reporting provisions of the Act require identification of sellers and the valuable articles received from them. There is nothing within the records themselves to incriminate the purchasers who keep them. Providing a prosecutor with a register is not like handing over a confession of wrongdoing; the holding of *Marchetti* is inapposite here. Moreover, the purpose of the Act is not to apprehend purchasers but to trace and retrieve stolen articles and identify those persons who have sold them. The Act is not directed at a group inherently suspect of criminal activities. It must be acknowledged that some purchasers who make the reports might be prosecuted, but that eventuality is dependent on additional evidence, external to the contents of the required records, that the purchaser bought stolen articles with awareness that the seller acquired them illicitly. As in *California v. Byers*, the reports here present only "the mere

---

**5.** In *United States v. Doe*, —— U.S. ——, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), the United States Supreme Court held that, although the contents of business records voluntarily prepared by a sole proprietor are not privileged, the act of producing those records may be. The Court expressly noted that the records in question were not required by law to be kept or disclosed to a public agency. We find nothing in the holding or the reasoning of *United States v. Doe* to call into question our reliance on *California v. Byers*, which is not cited in the *Doe* opinion.

possibility of incrimination [which] is insufficient to defeat the strong policies in favor of disclosure...." 402 U.S. at 428, 91 S.Ct. at 1538. We conclude that the Act does not violate the challengers' Fifth Amendment rights.

## VII.

We have considered the other arguments advanced by the coin dealers and conclude that they are without merit.

The order of the Jefferson County District Court in the *Meltzer* case dismissing the criminal charges is reversed and remanded for further proceedings consistent with this opinion. The order of the Adams County District Court in *Exotic Coins, Inc.* denying the coin dealers' request for a permanent injunction is affirmed.

## APPENDIX

## ARTICLE 16

## 8 C.R.S. (1984 Supp.).

**18–16–101. Legislative declaration.** The general assembly hereby finds and determines that illicit traffic in stolen valuable articles is encouraged by the absence of any required record-keeping system by persons purchasing such valuable articles. The general assembly further finds that law enforcement officials are hindered in the identification and recovery of stolen valuable articles, and that law enforcement officials are hindered in the discovery and identification of persons selling stolen valuable articles due to the absence of such a required record-keeping system. Accordingly, it is the intent of the general assembly, by enacting this article, to aid law enforcement officials in the discovery and identification of sellers of stolen valuable articles and in the identification and recovery of stolen valuable articles by providing a mandatory record-keeping and reporting system by purchasers and by providing a holding period during which time such articles shall not be disposed of or altered in any manner. Local governments may adopt ordinances more strict than the provisions of this article.

**18–16–102. Definitions.** As used in this article, unless the context otherwise requires:

(1) "Local law enforcement agency" means any marshal's office, police department, or sheriff's office with jurisdiction in the locality in which the purchaser makes the purchase.

(2) "Peace officer" means any undersheriff, deputy sheriff other than one appointed with authority only to receive and serve summons and civil process, police officer, state patrol officer, town marshal, or investigator for a district attorney or the attorney general who is engaged in fulltime employment by the state, a city, city and county, town, judicial district, or county within this state.

(3) "Precious or semiprecious metals or stones" means such metals as, but not limited to, gold, silver, platinum, and pewter and such stones as, but not limited to, alexandrite, diamonds, emeralds, garnets, opals, rubies, sapphires, and topaz. For the purposes of this article, ivory, coral, pearls, jade, and such other minerals, stones, or gems as are customarily regarded as precious or semiprecious are deemed to be precious or semiprecious stones.

(4) "Purchase" means giving money to acquire any valuable article, taking valuable articles in full or part satisfaction of a debt, taking valuable articles for resale for the purpose of full or part satisfaction of a debt, or taking valuable articles for sale on consignment.

(5) "Purchaser" means any person holding himself out to the public as being engaged in the business of buying valuable articles or any person who purchases five or more valuable articles during any thirty-day period. "Purchaser" does not include a person purchasing valuable articles from an estate or from a retail or wholesale merchant.

(6) "Seller" means any person offering a valuable article for money to any purchaser, offering a valuable article in full or part satisfaction of a debt, or offering a valuable article for resale for the purpose of full or part satisfaction of a debt.

(7)(a) "Valuable article" means any tangible personal property consisting, in whole or in part, of precious or semi-precious metals or stones, whether solid, plated, or overlaid, including, but not limited to, household goods, jewelry, United States commemorative medals or tokens, and gold and silver bullion.

(b) "Valuable article" shall also include foreign currency when purchased for more than its face value or foreign currency exchange value.

**18-16-103. Purchaser to identify seller.** (1) No purchaser shall purchase any valuable article without first securing adequate identification from the seller. The type and kind of identification shall be limited to the following:

(a) A valid Colorado driver's license;

(b) An identification card issued in accordance with section 42-2-402, C.R.S.;

(c) A valid driver's license, containing a picture, issued by another state;

(d) A military identification card;

(e) A valid passport;

(f) An alien registration card; or

(g) A nonpicture identification document issued by a state or federal government entity if the purchaser also obtains a clear imprint of the seller's right index finger.

**18-16-104. Purchases prohibited.** No purchaser shall purchase any valuable article from any person under the age of eighteen years.

**18-16-105. Purchaser to maintain register and obtain declaration of seller's ownership.** (1) Every purchaser of valuable articles shall keep a register, in a permanent, well-bound book, in which he shall record the following information: The name, address, and date of birth of the seller and his driver's license number or other I.D. number from any other allowed form of identification pursuant to section 18-16-103; the date, time, and place of the purchase; an accurate and detailed account and description of each valuable article being purchased, including, but not limited to, any trademark, identification number, serial number, model number, brand name, or other identifying marks on such articles and a description by weight and design of such articles. The purchaser shall also obtain a written declaration of the seller's ownership which shall state whether the valuable article is totally owned by the seller, how long the seller has owned the article, whether the seller or someone else found the article, and, if the article was found, the details of its finding.

(2) The seller shall sign his name in such register and on the declaration of ownership.

(3) Such register shall be made available to any peace officer for inspection at any reasonable time.

(4) The purchaser shall keep each register for at least three years after the last date of purchase of valuable articles described therein.

**18-16-106. Holding period.** (1) Except as provided in subsection (2) of this section, a purchaser shall hold all valuable articles within the jurisdiction of purchase for a period of thirty days from the date of purchase, during which time the valuable articles shall be held separate and apart from any other transaction and shall not be changed in form or altered in any way. The purchaser shall permit any requesting law enforcement officer to inspect the valuable articles during the thirty-day period.

(2) Stamped and assayed gold and silver bullion and gold coins shall not be subject to the holding requirement imposed by subsection (1) of this section. In lieu of such requirement, the purchaser shall be required to record the identity of any person to whom he transfers any such bullion or coins and the date, time, and place of such transfer.

**18-16-107. Reports required.** (1) Every purchaser of valuable articles shall provide the local law enforcement agency, on a weekly basis, with two records, on a form to be provided by the local law enforcement agency, of all valuable articles purchased during the preceding week and one copy of the seller's declaration of ownership. The form for recording such purchases shall contain the information required to be recorded in the purchaser's register pursuant to

to section 18–16–105 and shall also include a physical description of the seller and the dollar amount of the purchase. Said form shall be signed, at the time of the purchase, by the seller and by the individual purchaser or his agent who participated in the purchase. The local law enforcement agency shall designate the day of the week on which the records and declarations shall be submitted.

(2) A copy of such record and the seller's declaration of ownership shall also be forwarded to the local law enforcement agency having jurisdiction in the area where the seller resides.

(3) The local law enforcement agency shall forward copies of such records and declarations of sellers' ownership, upon request, to any other law enforcement agency.

**18–16–108. Penalty.** Any person who violates any of the provisions of this article commits a class 5 felony. Any person who knowingly gives false information with respect to the information required by sections 18–16–103 and 19–16–105 commits a class 5 felony.

**18–16–109. Applicability.** The provisions of this article shall not apply to private collectors purchasing collectors' items from other private collectors or businesses engaged in selling valuable articles exclusively as collectors' items, and who pay for such purchases by check, nor shall the provisions of sections 18–16–101 to 18–16–108 apply to valuable articles purchased exclusively in interstate commerce and paid for by check mailed to the seller in another state, if a record of the check by which payment was made and the name and address of the seller is maintained for a period of three years, or a retail merchant who, in a retail transaction involving the sale of a valuable article, receives another valuable article as a trade-in and credits the retail purchaser with the value thereof if the retail purchaser provides proof satisfactory to the retailer that the valuable article was originally purchased from that retailer. For the purpose of this section, a "private collector" is an individual, business, or corporation who purchases an item for a price based on the value of the article as a historical item rather than the prevailing market price of the item's metallic or stone composition; who has an interest in preserving the item in its unique or historical form and who does not alter the form of the article; and whose primary purpose is to keep the article in a collection or to sell to another collector.

**18–16–110. Severability.** If any provision of this article or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect the other provisions of this article which may be given effect without the invalid provision or application, and, to this end, the provisions of this article are declared to be severable.