**Gordon E. ECKLEY, Plaintiff–Appellant,**

v.

**COLORADO REAL ESTATE COMMISSION, Defendant–Appellee.**

**No. 86SA170.**

Supreme Court of Colorado, En Banc.

Feb. 22, 1988.

Bruce G. McLellan, Lakewood, Herbert A. Shatz, Denver, for plaintiff-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., James M. Humes, Asst. Atty. Gen., Denver, for defendant-appellee.

LOHR, Justice.

The Colorado Real Estate Commission (commission) charged appellant Gordon E. Eckley, a real estate broker, with eight counts of professional misconduct arising from his actions and omissions in arranging the sale of a tavern in Denver. The alleged misconduct consisted of violations of various state real estate licensing laws and commission rules. After an extensive evidentiary hearing, a hearing officer concluded that the commission had proved charges contained in five of the first seven counts and that in each instance the misconduct demonstrated unworthiness or incompetency to act as a real estate broker in violation of section 12–61–113(1)(n), 5 C.R.S. (1985).[1] The hearing officer recommended that the appellant's real estate broker's license be suspended for three years. The commission, in its final order, affirmed the hearing officer's findings and conclusions, but determined that the appellant's license should be suspended for one year instead of three. On appeal, the district court affirmed the commission's order.[2] The appellant sought review by the Colorado Court of Appeals, and the case was subsequently transferred to this court because the appellant challenged the constitutionality of section 12–61–113(1)(n). We affirm the judgment of the district court.

I.

We summarize the facts from the findings of the hearing officer. The appellant, Gordon E. Eckley, has been a licensed real estate broker in Colorado since 1949. At all relevant times, the appellant was engaged in business as an individual broker under the name of the Denver Real Estate Company.

In August 1981, the appellant acted as the broker in the sale of the White Horse Lounge (lounge) in Denver. The transaction was structured as a sale of all of the outstanding stock in 5130 W. Alameda, Inc., the owner of the lounge, by its sole shareholder, David Garcia, to the purchas-

---

1. Count eight alleged that the conduct charged in counts one through seven, taken separately or in combination, demonstrated unworthiness or incompetency on the part of Eckley. The hearing officer made determinations on the unworthiness or incompetency charges in addressing each of the first seven counts of misconduct and therefore found no need to consider count eight separately.

2. The commission did reject the conclusion of the hearing officer that Commission Rule E–14 does not require a broker to advise a prospective buyer to seek the aid of counsel in a transaction that involves a sale of a business opportu-

nity rather than a sale of real property. The district court, however, determined that the hearing officer's construction was correct and reversed the commission on this issue. In all other respects the commission affirmed the findings and conclusions of the hearing officer, and the district court affirmed the final order of the commission.

Under current law, review of a commission decision denying, suspending, or revoking a license is by appeal to the Colorado Court of Appeals rather than to the district court. § 12–61–114(4), 5 C.R.S. (1985).

er, Zelma Clark. As a result of the appellant's conduct during the transaction, the Colorado Real Estate Commission brought the charges against him that are at issue in this case.

A brief history of the ownership of the lounge is necessary to place the sale out of which the charges arose in its proper context. Between 1971 and 1980, the lounge was sold four times. The appellant acted as selling agent and received a commission in each of these transactions. Each of the sales involved one or more promissory notes executed by the purchaser in favor of the seller. Beginning with the second transfer of ownership, outstanding notes in favor of prior owners were not paid. Instead, the new notes wrapped around the outstanding debts.[3] By 1981, the lounge was in severe financial trouble. At that time, the lounge business was owned by 5130 W. Alameda, Inc. The corporation did not own the real property on which the tavern was situated, but instead leased it from a prior owner, Richard Senst.

Beginning in July 1981, the corporation was unable to make monthly rent payments and was forty-five days in arrears on two promissory notes originally made payable to a previous owner, Teresa Cooper. The first note was in the original amount of $110,000, payable in monthly installments of $1,550 including interest at 10% per year. The second note was in the original amount of $15,000, payable in monthly installments of $150 including interest at 10% per year. Cooper, who had owed a broker's fee to the appellant's brokerage company, continued to hold the first note but had assigned the second note to the appellant's wife in payment of that fee.

On August 15, 1981, David Garcia, the sole shareholder in 5130 W. Alameda, Inc., entered into an oral agreement with the appellant whereby the appellant was to act as selling agent for the lounge. At the time of the agreement, Garcia informed the

appellant that the business was near bankruptcy. He also told the appellant of a threat by Cooper to take legal action to collect her promissory note and by Senst to terminate the lease.

In late August 1981, Clark contacted the appellant's brokerage company, indicating that she wished to purchase a tavern in the Denver area. Clark had been attempting to buy a tavern for approximately one year but had not previously dealt with a broker. Clark was not sophisticated in business matters and was not knowledgeable about the types of financial transactions involved in the purchase of a tavern. She wished to acquire the tavern so that it could be run by her son and his girlfriend.

On August 25 or 26, 1981, employees of the appellant showed Clark a bar known as the Tumbleweed Inn. On August 28, Clark signed an offer to purchase that bar, drafted by the appellant. On the same day, however, the appellant informed Clark that the Tumbleweed Inn needed too much work before it could be opened for business. The appellant then voided the offer with Clark's acquiescence. Later that day, the appellant's employees showed Clark the White Horse Lounge, and Clark decided to purchase it shortly after seeing it.

On August 28, 1981, Clark signed a "Receipt and Option Contract," drafted by the appellant, which provided that Clark would purchase all of the corporate stock in 5130 W. Alameda, Inc. The contract also provided that the corporation would continue as lessee of the tavern premises. The agreement conditioned the completion of the sale on approval of the ownership change by the Denver liquor licensing authorities.[4] In addition to other financial provisions, the contract required that Clark immediately deposit $15,000 with the broker. Clark paid this money to the appellant on August 28.

---

3. The principal amount of the new note would include sums reflecting all of the outstanding prior purchase money obligations. The payee of the new note would be required to make the payments on the earlier obligations from periodic payments to be received on the new note.

4. Although approval by the state liquor licensing authorities was also contemplated, it was not specifically made a condition of the agreement. The evidence was that state approval can be expected almost routinely if local approval is obtained.

The appellant also drafted a disbursement agreement, which Clark signed on August 28. The agreement authorized the appellant to pay out of the $15,000 "escrow deposit the money for the whiskey, wine and beer the payments due on the loans and the September rent, utilities and etc. [sic]." At the time the disbursement agreement was signed, the appellant did not know the extent of the outstanding business obligations of the lounge, and made no representation to Clark on that subject.

Prior to the time Clark signed the contract documents, the appellant told her that the lounge was operating at a deficit, specifically that the rent was in arrears, as was payment on the Cooper note, and that Garcia needed $2,000 immediately to avoid bankruptcy. The appellant stated further that the lounge was a good business, potentially profitable and had made money in the past.

The appellant did not place the $15,000 deposit in a trust or escrow account. Instead, he deposited the money in his broker operating account. The appellant made twenty-four disbursements, totaling more than $10,000, from the account. All of the disbursements were for payment of outstanding obligations associated with the lounge business and for repairs necessary to bring the premises into compliance with building code and lease requirements. In addition, after the Denver liquor licensing authorities approved the transfer of ownership of the lounge in November 1981, the appellant paid his own commission from the escrow deposit. Because the deposit money was not preserved but went to pay outstanding obligations, the deposit was not available for refund to Clark in the event the liquor licensing authorities did not approve the ownership transfer or in the event the seller defaulted. The appellant intentionally did not bring to Clark's attention the fact that the deposit would not be available for refund.

At the time the documents for sale and purchase of the lounge business were signed, Clark was not represented by counsel. The appellant did not recommend or suggest to Clark that she obtain counsel before entering into the transaction. Furthermore, before signing the contract, Clark did not request an examination of the lounge's financial records, and the appellant did not suggest an examination of the records.

Clark took possession of the lounge on September 1, 1981, purportedly pursuant to a management agreement with the corporation. Garcia exercised no supervision over the lounge and received no moneys from lounge operations after that time. The ownership transfer was approved by Denver liquor licensing authorities on November 18, 1981, and by Colorado authorities on January 6, 1982. No formal closing of the sale and purchase ever took place. The stock certificates were transferred to Clark in early November 1981. Clark remained in possession until March 1982, when Cooper apparently foreclosed and took possession.

The commission charged the appellant with eight counts of misconduct, consisting of violations of state licensing laws and commission rules. In the eighth count, the commission alleged that the violations alleged in the first seven counts, taken separately or in combination, demonstrated the appellant's unworthiness or incompetency to act as a real estate broker, in violation of section 12–61–113(1)(n), 5 C.R.S. (1985). The hearing officer concluded that the commission had proved allegations in five of the first seven counts and that this misconduct in each instance constituted unworthiness or incompetency to act as a real estate broker.[5] The specific findings upon which the hearing officer based her conclusions are discussed individually in part III of this opinion.

The hearing officer recommended a three-year suspension of the appellant's license with reinstatement to be conditioned upon successful completion of real estate courses related to the violations in the case. The commission affirmed the findings and conclusions of the hearing officer but

5. As to the eighth count, see n. 1, above.

adopted a period of suspension of one year for each violation, the periods of suspension to run concurrently. The district court affirmed the commission's order, and clarified the number of concurrent sentences imposed as one for each of the five counts that had been proved.[6]

The appellant appealed the district court's order to the court of appeals, contending that section 12–61–113(1)(n) is unconstitutionally vague and that the commission's findings were arbitrary and capricious. Because the appellant challenges the constitutionality of section 12–61–113(1)(n), the appeal was transferred to this court pursuant to section 13–4–110(1)(a), 6A C.R.S. (1987).[7]

## II.

Section 12–61–113(1)(n), 5 C.R.S. (1985), gives the commission the power to discipline a licensee who is guilty of "[h]aving demonstrated unworthiness or incompetency to act as a real estate broker or salesman by conducting his business in such a manner as to endanger the interest of the public." The appellant contends that the terms "incompetency" and "unworthiness" as employed in section 12–61–113(1)(n) are unconstitutionally vague. We disagree.

 Statutes are presumed to be constitutional, and a party asserting that a particular statute is unconstitutional has the burden of proving that proposition beyond a reasonable doubt. *E.g., People v. O'Cana,* 725 P.2d 1139, 1140 (Colo.1986). A statute offends due process of law, however, if it is so vague that it does not provide fair warning of the conduct prohibited or if its standards are so ill-defined as to create a danger of arbitrary and capricious enforcement. *E.g., Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92

S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); *Exotic Coins, Inc. v. Beacom,* 699 P.2d 930, 943 (Colo.1985), *appeal dismissed,* 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 214 (1985). A statute is not void for vagueness if it fairly describes the conduct forbidden, and persons of common intelligence can readily understand its meaning and application. *E.g., Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *People v. O'Cana,* 725 P.2d at 1141; *Exotic Coins, Inc.,* 699 P.2d at 943.

 The vagueness test "is not an exercise in semantics to emasculate legislation; rather, it is a pragmatic test to ensure fairness." *People v. Sequin,* 199 Colo. 381, 388, 609 P.2d 622, 627 (1980). *Accord, e.g., People v. Revello,* 735 P.2d 487, 490 (Colo.1987). Statutory terms need not be defined with mathematical precision in order to pass constitutional muster. *Exotic Coins, Inc.,* 699 P.2d at 943. Instead, the statutory language must strike a balance between two potentially conflicting concerns: it must be specific enough to give fair warning of the prohibited conduct, yet must be sufficiently general to address the problem under varied circumstances and during changing times. *E.g., Kibler v. State,* 718 P.2d 531, 534 (Colo.1986); *Colorado Auto & Truck Wreckers Ass'n v. Dep't of Revenue,* 618 P.2d 646, 651 (Colo. 1980). We are satisfied that the statutory terms challenged by the appellant are sufficiently definite to withstand a vagueness attack.

We have held in another context that the term "incompetency" is sufficiently precise that persons of common intelligence would not have to guess at its meaning. *Benke v. Neenan,* 658 P.2d 860, 861 (Colo.1983). In *Benke,* we analyzed section 22–63–116, 9 C.R.S. (1973), now section 22–63–116, 9 C.R.S. (1987 Supp.), which provides

6. As explained in n. 2 above, however, there was one exception to the affirmance of the hearing officer's findings and conclusions by the commission and of the commission's final order by the district court.

7. Section 13–4–110(1)(a) provides:
When a party in interest alleges, or the court is of the opinion, that a case before the court of appeals is not properly within the jurisdic-

tion of the court of appeals, the court of appeals shall refer the case to the supreme court. The supreme court shall decide the question of jurisdiction in a summary manner, and its determination shall be conclusive. This case was not properly before the court of appeals because the appellant challenges the constitutionality of § 12–61–113(1)(n). *See* § 13–4–102(1)(b), 6A C.R.S. (1987).

grounds for dismissal of tenure teachers. One of the grounds is incompetency. We stated that "[c]ompetence indicates the ability to perform ably and above a minimum level of sufficiency," *Benke,* 658 P.2d at 861–62, and that as so defined the term is not unconstitutionally vague. *See also Lee v. State Bd. of Dental Examiners,* 654 P.2d 839, 845 (Colo.1982) ("incompetence" refers to a demonstrated lack of ability to perform a required duty). We see no difference in substance between the definition adopted in *Benke* and that set forth in *Lee.* These definitions are equally applicable to the real estate brokerage statute now before us. We therefore hold that the word "incompetency" as employed in the context of section 12–61–113(1)(n) is sufficiently precise that persons of common intelligence and understanding would not have to guess at its meaning or differ as to its application. *See Connally v. General Constr. Co.,* 269 U.S. at 391, 46 S.Ct. at 127; *Exotic Coins, Inc. v. Beacom,* 699 P.2d at 943.[8]

We also hold that the term "unworthiness" as used in section 12–61–113(1)(n) is precise enough that persons of common intelligence can readily understand its meaning and application. "Unworthiness" is defined as "the quality or state of being unworthy"; "unworthy," in turn, is defined as "not fit, becoming, or suitable." *Webster's New World Dictionary,* 1599 (College Ed. 1957). Therefore, the concept of unworthiness in the context of section 12–61–113(1)(n) contemplates conduct or behavior in connection with the business of real estate brokerage that demonstrates the actor to be so unfit or unsuitable to act as a real estate broker or salesman as to endanger the interest of the public.

We have held that "[a]cts and conduct on the part of an attorney which establish that he is incapable of being trusted, when coupled with acts of dishonesty and deceit, render that person unworthy of public confidence...." *People v. Radinsky,* 176 Colo. 357, 360, 490 P.2d 951, 952 (1971). Thus, deceitful conduct renders a person unworthy to engage in the profession of the practice of law. We believe that unworthiness as defined in section 12–61–113(1)(n) also includes deceit as one form of unworthiness. In a similar context, a New Jersey court has held that unworthiness also signifies a lack of those ethical qualities that befit the profession of real estate brokerage. "By including the matter of unworthiness in [the licensing laws], the Legislature has charged the Commission with the high responsibility of maintaining ethical standards among real estate brokers and salesmen." *Goodley v. New Jersey Real Estate Comm'n,* 29 N.J.Super. 178, 102 A.2d 65, 67 (App.Div.1954). *See also Wright v. State ex rel. State Real Estate Comm'n,* 208 Neb. 467, 304 N.W.2d 39, 42 (1981) ("unworthiness," in the context of a statute specifying grounds for revoking or suspending a real estate broker's license, signifies a lack of those ethical qualities that befit the vocation); *In Re Parkwood Co.,* 98 N.J.Super. 263, 237 A.2d 265, 270–71 (App.Div.1967) ("incompetency" and "unworthiness" constitute adequate standards of conduct under statute prescribing standards for disciplining insurance agents and brokers).

---

**8.** Other jurisdictions have upheld the constitutional sufficiency of the term "incompetence" when used as a ground for the revocation of real estate brokers' licenses. The Supreme Court of Nebraska, construing a statute similar to section 12–61–113(1)(n), defined incompetence as "failure to meet requirements for a minimal level of accepted conduct." *Weiner v. State ex rel. State Real Estate Comm'n,* 217 Neb. 372, 348 N.W.2d 879, 882 (1984). In *Weiner,* the state real estate commission had found that a real estate broker had demonstrated incompetence and unworthiness to act as a real estate broker, and had suspended the broker's license for three years. The court rejected the broker's vagueness attack on the statute under which he was suspended, holding that the term "incompetence" in statutes pertaining to the suspension or revocation of licenses was not unconstitutionally vague. *Id.* 348 N.W.2d at 882. *See also Miller v. Iowa Real Estate Comm'n,* 274 N.W.2d 288 (Iowa 1979) (statute specifying incompetence and unworthiness as grounds for revocation of real estate broker's license held not unconstitutionally vague); *Maine Real Estate Comm'n v. Kelby,* 360 A.2d 528, 532 (Me.1976) (the statutory term "incompetency" is neither so general that persons of common intelligence must guess at its meaning, nor so indefinite as to defy evenhanded interpretation by the judiciary).

The term "unworthiness" in the statute adequately alerts licensees and regulators alike to the prohibition of deceitful or unethical conduct. At the same time, the term is sufficiently general to be applicable to the myriad problems associated with real estate transactions. Therefore, we hold that the term "unworthiness," as it embodies the concepts of deceit and failure to measure up to the ethical standards of the real estate brokerage profession, is not unconstitutionally vague.

In reaching the conclusion that "incompetency" and "unworthiness" are sufficiently descriptive to withstand a vagueness challenge, we consider it of some importance that the statute in which those terms are employed relates to a profession in which standards of acceptable practice have developed by custom and tradition over the years. The persons engaged in that profession are the persons whose conduct is to be governed by section 12–61–113(1)(n), and the authority charged with enforcement of that statute is the commission, an agency intimately familiar with real estate brokerage practice. In these circumstances, the potential for misunderstanding by the persons regulated or by the enforcing authorities is minimized. *See, e.g., Maine Real Estate Comm'n v. Kelby*, 360 A.2d 528, 532 (Me.1976) (statute proscribes incompetency not in the abstract but on the part of real estate brokers and salesmen; it therefore codifies the normative standards that guide the real estate profession and is sufficiently definite to apprise those in the profession of the line between permissible and forbidden conduct); *Miller v. Iowa Real Estate Comm'n*, 274 N.W.2d 288, 292 (Iowa 1979) (language of statute proscribing unworthiness or incompetency to act as real estate broker becomes clear and unequivocal when measured by common understanding and practice in that profession). *Cf. Benke v. Neenan*, 658 P.2d 860 (Colo.1983) (regulation of teachers); *People v. Radinsky*, 176 Colo. 357, 490 P.2d 951 (1971) (regulation of attorneys).

### III.

The appellant next contends that the findings of the commission and the district court were arbitrary and capricious.[9] Agency action that is arbitrary and capricious can be held unlawful and set aside. § 24–4–106(7), 10 C.R.S. (1982). In order for a court to set aside agency action under section 24–4–106(7) on the ground that it was arbitrary and capricious, the court must find that the action is unsupported by any competent evidence. *Dolan v. Rust*, 195 Colo. 173, 175–76, 576 P.2d 560, 562 (1978); *Bd. of County Comm'rs of Jefferson County v. Simmons*, 177 Colo. 347, 350, 494 P.2d 85, 87 (1972). Agency action will also be set aside if it is based on findings of basic or evidentiary fact that are "clearly erroneous on the whole record, unsupported by substantial evidence when the record is considered as a whole, or otherwise contrary to law." § 24–4–106(7), 10 C.R.S. (1982). *See DeScala v. Motor Vehicle Division of Department of Revenue*, 667 P.2d 1360, 1363 (1983); *Ricci*

9. Standards for judicial review of commission action are set forth in § 24–4–106(7), 10 C.R.S. (1982). *See also,* § 12–61–114(4), 5 C.R.S. (1985); § 24–4–106(11)(a), 10 C.R.S. (1982). § 24–4–106(7) provides:

 If the court finds no error, it shall affirm the agency action. If it finds that the agency action is arbitrary or capricious, a denial of statutory right, contrary to constitutional right, power, privilege, or immunity, in excess of statutory jurisdiction, authority, purposes, or limitations, not in accord with the procedures or procedural limitations of this article or as otherwise required by law, an abuse or clearly unwarranted exercise of discretion, based upon findings of fact that are clearly erroneous on the whole record, unsupported by substantial evidence when the record is considered as a whole, or otherwise contrary to law, then the court shall hold unlawful and set aside the agency action and shall restrain the enforcement of the order or rule under review, compel any agency action to be taken which has been unlawfully withheld or unduly delayed, remand the case for further proceedings, and afford such other relief as may be appropriate. In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party. In all cases under review, the court shall determine all questions of law and interpret the statutory and constitutional provisions involved and shall apply such interpretation to the facts duly found or established.

*v. Davis*, 627 P.2d 1111, 1116–18 (Colo. 1981).

While the appellant styles his appeal as an attack on the hearing officer's evidentiary findings, a reading of his brief makes it clear that he is also challenging the hearing officer's legal conclusions. Therefore, we will address the appellant's evidentiary attacks and his other challenges to the legal sufficiency of the hearing officer's conclusions as well.

## A.

■ The appellant first challenges the hearing officer's factual finding as to count one that the appellant did not make the financial records of the lounge available to Clark before she signed the receipt and option agreement to purchase the lounge. Even if the factual premise is correct, the appellant asserts, he had no legal obligation to make such records available to a buyer voluntarily and without request prior to closing.

The record amply supports the hearing officer's finding that the appellant knew of the existence of financial records of the lounge prior to the execution of the receipt and option contract, and the appellant admitted in his own testimony that he did not make such information available to the buyer. The real thrust of the appellant's challenge is that such disclosure is not required by statute or rule and that, as he testified, no seller would make such records available prior to obtaining a signed contract. An expert witness testified for the commission, however, that even in absence of a request, a competent broker under the circumstances of this transaction would have voluntarily made financial records available to Clark before the receipt and option contract was signed. The hearing officer properly inferred from the testimony that the purpose of such action would have been to protect the seller from later claims by the purchaser that the seller had misrepresented the condition of the business. The hearing officer concluded that the appellant's failure to make the records available in this case demonstrated a lack of knowledge and ability to carry out

his professional functions and demonstrated incompetency to act as a real estate broker by conducting business in such a manner as to endanger the interest of the public in violation of section 12–61–113(1)(n).

In reaching the conclusion that the appellant had demonstrated incompetency by failing to make the financial records of the lounge available to Clark, even in absence of a request, the hearing officer relied on the specific circumstances of the sale of the lounge, including the inexperience of the buyer, the fact that the buyer was unrepresented by counsel, the poor financial condition of the business, and the broker's personal interest in selling the business in order to preserve the value of the promissory note held by his wife and to be assumed by the buyer as part of the purchase price. The findings of fact are supported by substantial evidence, including expert testimony, and we agree with the hearing officer that the findings support a determination of incompetency under section 12–61–113(1)(n).

## B.

■ The appellant next contests the hearing officer's conclusion concerning count three that the appellant's failure to recommend legal counsel to Clark constituted a violation of section 12–61–113(1)(n). Real Estate Commission Rule E–14 states:

> A real estate licensee shall recommend, before the closing of a real estate transaction, the examination of title, and shall advise the use of legal counsel.

4 C.C.R. 725–1 (1987). The hearing officer concluded that the commission intended Rule E–14 to apply to transactions involving the sale of real property only. The hearing officer determined that because the sale did not involve the sale of real property, but rather a sale of stock, Rule E–14 did not apply. Nevertheless, the hearing officer concluded that the appellant's failure to recommend that Clark obtain counsel demonstrated his incompetency and unworthiness in violation of section 12–61–113(1)(n). The commission, however, overruled the hearing officer and found

that Rule E–14 applied to business opportunity transactions like the one here, and that the appellant's conduct thus constituted a violation of Rule E–14. The district court reversed the commission on this issue and restored the conclusion of the hearing officer. We need not decide here whether Rule E–14 applies solely to transactions involving the sale of real property. We do not reach the question because we agree with the hearing officer that the appellant's conduct in failing to recommend to Clark that she obtain counsel violated section 12–61–113(1)(n) without regard to the applicability of Rule E–14.

Clark was unrepresented when she signed the receipt and option contract. She did not retain an attorney until approximately three weeks after the contract documents had been signed and there was little that counsel could do to alter the basic legal structure of the transaction. The transaction was complicated, involving evaluation of a lease, two wraparound loan agreements, and payments to third parties in satisfaction of other debts. Given the complexity of the transaction, and the financial state of the business, it is inconceivable that an attorney would not have pursued a thorough review of the tavern's books and records. Finally, an attorney could have carefully examined the nature of the $15,000 deposit, and offered counsel regarding the general risks and obligations of the parties to the contract pending approval of the liquor license transfer. The commission's expert testified that an ordinarily competent broker would have advised Clark to consult an attorney prior to entering into the transaction. The record contains substantial, competent evidence that fully supports the hearing officer's determination that the appellant's failure to advise Clark to consult an attorney in these circumstances constituted unworthiness and incompetency in violation of section 12–61–113(1)(n).

## C.

As to count four, the hearing officer found that the appellant's conduct in relation to the $15,000 deposit constituted substantial and willful misrepresentation in violation of section 12–61–113(1)(a), 5 C.R.S. (1985). The hearing officer found that this same conduct constituted incompetency or unworthiness in violation of section 12–61–113(1)(n).

"A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation." *Restatement (Second) of Torts* § 529 (1977). The hearing officer first found that the disbursement agreement authorizing payments to be made from the $15,000 deposit in advance of closing constituted a statement that was misleading because of its incompleteness.

The disbursement agreement authorizes payment "for the whiskey, wine and beer the payments due on the loans and the September rent, utilities and etc. [sic]." The document does not reveal that the $15,000 would be used to bring the premises into compliance with code and lease requirements, as in fact it was. Nor did the appellant inform Clark that the money would be used for such purposes. We agree with the hearing officer that the fact that payments were made from the $15,000 that were of a different nature from those listed in the agreement made the disbursement agreement misleading. We also are satisfied that substantial evidence supports the hearing officer's finding that this misleading omission was willful.

The hearing officer next found that the language of the disbursement agreement implied knowledge by the appellant that the obligations listed in the disbursement agreement would not exceed $15,000 when in fact the appellant did not know the extent of the outstanding obligations. We agree with the hearing officer that the appellant's statement, through the disbursement agreement, implied knowledge that the appellant did not possess, and thus constituted a misrepresentation. *See Restatement (Second) of Torts* § 526(c) (1977); *Duke v. Pickett,* 168 Colo. 215, 218, 451 P.2d 288, 290 (1969). We also agree that the misrepresentation was substantial,

and that substantial evidence supports the hearing officer's finding that it was willful.

Finally, the hearing officer concluded that the appellant engaged in misrepresentation by failing to inform Clark that the $15,000 deposit would not be fully refundable if the seller defaulted or the liquor license transfer was not approved. We agree. When a seller defaults on a real estate sales contract, the selling broker ordinarily is obligated to return to the buyer the full amount of the deposit or down payment received from the buyer. *Stortroen v. Beneficial Fin. Co.*, 736 P.2d 391, 398 (Colo.1987). Nothing in the disbursement agreement explicitly states what will happen to the deposit upon default. Here, because much of the $15,000 was disbursed to pay other expenses, upon default the $15,000 could not have been returned to Clark. The appellant, who structured the transaction and drafted the disbursement agreement, failed to inform Clark, an unsophisticated buyer, of this potential consequence.

The appellant's omission to advise Clark concerning her rights in regard to the deposit if the transaction were not completed through no fault of her own constituted fraudulent concealment. The elements of fraudulent concealment are: 1) concealment of a material existing fact that in equity and good conscience should be disclosed; 2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; 3) ignorance of that fact on the part of the one from whom the fact is concealed; 4) the intention that the concealment be acted upon; and 5) action on the concealment resulting in damages. *Kopeikin v. Merchants Mortgage & Trust Corp.*, 679 P.2d 599, 601 (Colo.1984); *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (1937). In order to prevail on a claim of fraudulent concealment, a plaintiff must show that the defendant actually knew of a material fact that was not disclosed and that the defendant's intent was to cause the plaintiff to act differently than he might have done had the information been disclosed. *Kopeikin,* 679 P.2d at 601–02.

The appellant did not inform Clark about the possibility of losing the deposit. Knowledge of such a consequence could well have caused Clark to forego the purchase. The hearing officer did not err factually or legally in concluding that the appellant engaged in misrepresentation—in this case, fraudulent concealment.

We also agree with the hearing officer that the appellant's conduct in regard to the various types of misrepresentation constituted incompetency and unworthiness under section 12–61–113(1)(n).

### D.

■ As to count five the hearing officer found that the appellant's failure to place the $15,000 deposit into his broker trust account violated section 12–61–113(1)(g.5) and (1)(k), 5 C.R.S. (1985), and commission Rule E–1, 4 C.C.R. 725–1 (1986). We agree. Section 12–61–113(1)(g.5) and Rule E–1 require, among other things, that a broker place the funds of others into an escrow or a trust account. Subsection (k) of section 12–61–113(1) prohibits brokers from violating other subsections of that same statute and from violating commission rules. The appellant's failure to place the $15,000 into an escrow account violated section 12–61–113(1)(g.5), and Rule E–1, and thus section 12–61–113(1)(k). We also agree with the hearing officer that the appellant's actions in this regard constituted incompetency and unworthiness under section 12–61–113(1)(n).

The appellant argues, however, that the exigencies of the transaction, involving a financially distressed seller and a buyer anxious to complete the transaction, necessitated or justified that the $15,000 payment be deposited into his account to facilitate prompt payment of bills pursuant to the disbursement agreement. The appellant's actions in this case belie his claim. Although he disbursed some of the deposit shortly after receipt, a substantial portion was not paid out until later. For example, the appellant did not pay his own commission from this deposit until after the transfer of the ownership had been approved by the Denver liquor licensing authorities on

November 18, 1981. At any rate, a need for haste does not excuse commingling of funds in violation of specific statutory prohibitions. Accordingly, the appellant's argument that a need for haste justified the commingling of funds in this case is unpersuasive.

### E.

■ Finally, the hearing officer found as to count six that the appellant failed to provide Clark with a sufficiently detailed closing statement, thereby violating commission Rule E–5(b), 4 C.C.R. 725–1 (1983). Rule E–5(b) specifies the requirements of closing statements in all business opportunity or real estate transactions.[10] The hearing officer found that by violating Rule E–5(b), the appellant violated section 12–61–113(1)(h), 5 C.R.S. (1985), which requires that closing statements be provided to purchasers and sellers and that such statements comply with commission rules. The hearing officer found that the appellant provided a closing statement which failed to show the date of closing, the proration date for all items, the itemization of money or things of value received or paid, or the dates of adjustments. The appellant does not contest these evidentiary findings. We agree with the hearing officer that the closing statement provided to the purchaser in this case failed to comply with Rule E–5(b) and that the appellant thus violated section 12–61–113(1)(h).[11]

The appellant asserts that the closing statement contained all necessary informa-

tion and that in any event it was approved by the buyer's attorney. A review of the record, however, demonstrates that the statement is flawed by each of the deficiencies found by the hearing examiner. Furthermore, the approval of the buyer's counsel does not eliminate or modify a broker's obligation to provide settlement statements that comply with the statute and the rules. We agree with the hearing officer that the appellant's failure to provide a sufficient closing statement demonstrates incompetency and unworthiness under section 12–61–113(1)(n).

### F.

■ In defense of the charges contained in the individual counts and in opposition to the imposed discipline of license suspension, the appellant asserts that the approval of the transfer of ownership by local and state licensing authorities, a process that required submission to these authorities of the various documents by which the sale of the lounge was accomplished, should cure any violation of the real estate licensing statutes and commission rules.

We are unpersuaded by this argument. Liquor licensing authorities are separate entities with separate standards governing their operation. The commission rules and state real estate broker licensing laws are concerned specifically with assuring that real estate transactions are conducted honestly and competently so as to safeguard

---

10. Rule E–5(b) provides in pertinent part:
 The closing statement or statements of all real estate or business opportunity transactions in which a real estate broker participates shall show the date of closing, the total purchase price of the property, itemization of all adjustments, money, or things of value received or paid showing to whom each item is credited and/or to whom each item is debited, the dates of the adjustments shall be shown if not the same as the date of the closing, also shown shall be the balances due from the respective parties to the transaction, and the names of the payees, makers and assignees, of all notes paid or made or assumed; the statements furnished to each party to the transaction shall contain an itemization of such credits and such debits as pertain to each respective party. . . .

11. Section 12–61–113(1)(h) proscribes the following conduct:
 Failing to provide the purchaser and seller of real estate with a closing statement of the transaction, containing such information as may be prescribed by the rules and regulations of the commission or failing to provide a signed duplicate copy of the listing contract and the contract of sale or the preliminary agreement to sell to the parties thereto;
 Although the statute speaks of only a "real estate" sale, Commission Rule E–5(b) applies to "business opportunity transactions" as well. We believe that the commission in enacting Rule E–5(b) appropriately interpreted the statute to include business opportunity transactions.

the interest of the public. *See* § 12–61–102, 5 C.R.S. (1985). These statutes and rules clearly govern the appellant's actions here. The appellant's failure to meet the standards prescribed by the relevant statutes and rules may not be vindicated by reference to action by a separate agency.

For the foregoing reasons, we affirm the judgment of the district court.