**COLORADO STATE BOARD OF MEDICAL EXAMINERS, Petitioner–Appellee,**

v.

**N. Balfour SLONIM, Respondent–Appellant.**

**No. 91CA0998.**

Colorado Court of Appeals,
Div. IV.

June 18, 1992.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John S. Sackett, Asst. Atty. Gen., Denver, for petitioner-appellee.

Fish & Coles, Kenneth R. Fish, Kent R. Saraceno, Denver, for respondent-appellant.

Opinion by Judge DAVIDSON.

Respondent, N. Balfour Slonim, appeals from the order of the Colorado State Board of Medical Examiners (Board) issuing to him a letter of admonition for substandard care with regard to one of his patients, C.I. We set aside the Board's order.

Respondent became licensed to practice medicine in October 1946, completed an internal medicine residency in 1950, became licensed in Colorado in 1951, and has maintained a private internal medicine practice since 1952. He has specialized training or experience in psychiatry and, within the scope of his internal medicine practice, has devoted approximately ten percent of his practice to diagnosing and treating psychiatric and emotional disorders, including depression.

Respondent met C.I. in 1982, at which time he referred her to a psychiatrist. She remained in the regular care of a psychiatrist from this time until June 1986. In January 1985, she formally consulted respondent as an internist for medical care.

Respondent diagnosed C.I. as having, *inter alia*, moderate depression, noted that her medical records indicated that she used alcohol excessively, and prescribed Dexedrine, a psychostimulant, for her depression. He continued this course of treatment for approximately 18 months, seeing C.I. regularly for office visits. He wrote a total of seven prescriptions for Dexedrine between January 1985 and October 1986. From April 1985 through at least May

1986, C.I.'s depression improved and her alcohol use decreased. C.I. remained a patient of respondent's until March 1987.

In 1984, the Board promulgated a rule (amphetamine rule) which, among other things, restricts the use of stimulants such as Dexedrine for the treatment of depression. Specifically, the rule states that stimulants are "Possibly Acceptable" for the "Treatment of depression shown to be refractory to other treatments."

In May 1990, the inquiry panel of the Board initiated a formal complaint against respondent. Pursuant to § 12–36–118(1), C.R.S. (1991 Repl.Vol. 5B), the matter was assigned to an Administrative Law Judge (ALJ) for hearing.

As pertinent here, two counts of unprofessional conduct were brought against respondent, both based on the seven occasions during 1985 and 1986 in which he prescribed Dexedrine to C.I. Specifically, count III alleged that respondent violated the amphetamine rule by prescribing Dexedrine without first trying other clinically indicated drugs and, in so doing, violated Colo.Sess.Laws 1979, ch. 108, § 12–36–117(1)(p) at 512, in that he engaged in "two or more acts or omissions which fail to meet generally accepted standards of medical practice."

Count IV alleged that respondent also engaged in unprofessional conduct by "prescribing [a] controlled substance ... other than in the course of legitimate professional practice" as prohibited by § 12–36–117(1)(g), C.R.S. (1991 Repl.Vol. 5B).

At the close of complainant's case, the ALJ granted respondent's motion to dismiss count IV pursuant to C.R.C.P. 41(b)(1) on the grounds that the Board had failed to show any acts by respondent which were "other than in the course of legitimate professional practice." Specifically, the ALJ determined that the Board had proven only that respondent's conduct in prescribing the Dexedrine was substandard medical practice and that § 12–36–117(1)(g) requires "something more than mere substandard administering, dispensing or prescribing" of a controlled substance.

At the conclusion of the hearing on the remaining count, the ALJ determined that respondent's prescribing of Dexedrine to C.I. "did violate the Amphetamine Rule and constituted an act which failed to meet generally accepted standards of medical practice." However, because she concluded that respondent had committed only one act of substandard care when he prescribed the Dexedrine, the ALJ determined that there was no unprofessional conduct under the then applicable statutory provision and, thus, dismissed the remaining count.

The parties filed exceptions with the Board pursuant to § 24–4–105(14), C.R.S. (1988 Repl.Vol. 10A). On review, the hearing panel determined that respondent had engaged in unprofessional conduct on both counts. Specifically, regarding count IV, it determined that respondent's substandard prescribing of the Dexedrine in and of itself constituted prescribing "other than in the course of legitimate professional practice" and, with respect to count III, that respondent's conduct constituted "two or more" acts of substandard medical practice. It then issued a letter of admonition to respondent. This appeal followed.

I.

As a threshold matter, we address the issue of the Board's authority to review the ALJ's dismissal of the matter against respondent. Respondent argues that, pursuant to § 12–36–118(5)(g)(II), C.R.S. (1991 Repl.Vol. 5B), there is no administrative appeal from a determination by an ALJ that charges are unfounded and unproven. We disagree.

Section 12–36–118(5)(g)(II) provides:

If it is found that the charges are unfounded and unproven, the hearings panel, or an administrative law judge sitting in lieu of the hearings panel pursuant to subsection (1) of this section, shall enter an order dismissing the complaint; whereupon, the matter shall be terminated....

A statute must be given effect according to the intent of the General Assembly. *Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106 (Colo.1990). If the statutory

language is clear and unambiguous, there is no need to resort to interpretive rules of statutory construction. However, if the statutory language lends itself to alternative constructions, the court may look to pertinent legislative history to determine which alternative construction is in accordance with the intent of the General Assembly. *Griffin v. S.W. Devanney & Co.*, 775 P.2d 555 (Colo.1989).

Respondent argues that a plain reading of § 12–36–118(5)(g)(II) reveals that, if an ALJ finds that a charge of unprofessional conduct is unproven, an order dismissing the complaint is mandatory, the proceeding against respondent terminates as a matter of law, and thus, the Board has no authority to review the dismissal.

On the other hand, the Board points to the language of the provision stating that the dismissal is by "an administrative law judge sitting in lieu of the hearings panel pursuant to subsection (1) of this section." The Board argues, therefore, that the ALJ has only the power to issue initial decisions and that those initial decisions are reviewable by the hearings panel pursuant to § 12–36–118(1).

Because, in our view, the language lends itself to alternative interpretations, we apply the foregoing principles of statutory construction to determine the General Assembly's intent.

Initially, we distinguish between an ALJ who sits *in lieu of* the hearings panel and an ALJ who *presides* at a hearing conducted by the hearings panel. Under § 12–36–118(1), an ALJ sits in lieu of the hearings panel if an "inquiry panel of the board [elects] to refer a case for formal hearing to a qualified administrative law judge … for his initial decision." In such case, the ALJ conducts the hearing alone or with an advisor assigned by the Board. Section 12–36–118(1).

In contrast, an ALJ who *presides* does so at a hearing conducted by the hearings panel and the ALJ advises the panel solely on legal matters. *See* § 12–36–118(5)(f), C.R.S. (1991 Repl.Vol. 5B).

Prior to 1982, there were no provisions within the Medical Practice Act, 12–36–101, et seq., C.R.S. (1991 Repl.Vol. 5B), whereby an ALJ could hear a case in lieu of the hearings panel. All matters referred to the Board for formal hearing were heard by the hearings panel.

However, in 1982, the General Assembly amended the Medical Practice Act to allow a hearing officer—now referred to as an ALJ—to hear cases in lieu of the hearings panel and to render an "initial decision pursuant to the provisions of section 24–4–105" which "may be reviewed pursuant to § 24–4–105(14) and (15)." Section 12–36–118(1).

At the same time, as pertinent here, the General Assembly amended four other subparagraphs of § 12–36–118. In three instances, the inserted language reads: "Except as provided in subsection (1) of this section…." *See* § 12–36–118(5)(e), (f), and (g)(I), C.R.S. (1991 Repl.Vol. 5B). The inserted language in the fourth amended subparagraph reads "or [an ALJ] sitting in lieu of the hearings panel pursuant to subsection (1) of this section." Section 12–36–118(5)(g)(II). We conclude that this language is intended to incorporate subparagraph (1) fully into these latter provisions.

■ Thus, § 12–36–118(5)(g)(II) does not alone define how an ALJ is to handle a case in which the charges are unproven. Rather, by the specific reference to subsection (1), the ALJ's decision to dismiss the complaint and to terminate the matter is an initial decision pursuant to provision 12–36–118(1) and is reviewable by the Board.

This interpretation is supported by discussions during the House hearing on the amendment. Nothing was presented there to suggest an intent to shift the authority for making Board decisions from the hearings panel to the ALJ. The Department of Regulatory Agencies presented evidence in the hearing that the purpose of the amendment was to aid the Board with its caseload by providing "an optional route as to where the evidentiary hearings will be held." *See* Hearings on H.B. 1105 before the Committee on Health, Environment, Welfare and Institutions, 53rd General Assembly, Second Session (January 13, 1982).

Further, we note that the ALJ's order is denominated "Initial Decision" and within the text of the decision she stated: "Pursuant to Sections 12–36–118(1)(g), 118(5)(I) and 118(5)(II), it is the Recommendation and Initial Decision of the A.L.J. that this matter be dismissed."

Accordingly, we conclude that the ALJ's determination that charges were unproven was an initial decision and was properly reviewed by the Board pursuant to § 12–36–118(1).

## II.

Respondent next asserts that the amphetamine rule, as set forth in 3 Code Colo.Reg. 713–8, is unconstitutionally vague. We disagree.

■ It is generally presumed that administrative rules and regulations comport with constitutional standards. *People v. Lowrie,* 761 P.2d 778 (Colo.1988). The burden is upon the party attacking such provisions to establish their invalidity beyond a reasonable doubt. *Colorado Civil Rights Commission v. Travelers Insurance Co.,* 759 P.2d 1358 (Colo.1988).

■ To survive a vagueness challenge, a regulation must be sufficiently clear so that persons of common intelligence will have fair warning as to what conduct is prohibited, and it must provide standards explicit enough to prevent arbitrary and capricious application. *Continental Liquor Co. v. Kalbin,* 43 Colo.App. 438, 608 P.2d 353 (1977); *see Colorado Civil Rights Commission v. Travelers Insurance Co., supra.*

The amphetamine rule provides:

Prescriptions for stimulants (amphetamine or sympathomimetic amine drugs designated as Schedule II controlled substances) are acceptable only for the following clinical indications:

Acceptable: (a) Hyperkinesis/attention deficit disorder

(b) Narcolepsy

(c) Approved clinical investigation within a research protocol of the effects of such drugs

*Possibly Acceptable* under the circumstances of the case:

(a) Organic brain dysfunction

(b) Differential diagnostic psychiatric evaluation of depression

(c) *Treatment of depression shown to be refractory to other treatments.* (emphasis added)

The rule's stated purpose is "to further define unprofessional conduct, specifically the generally accepted standards of medical practice regarding prescribing of stimulant drugs, more generally set forth in C.R.S. § 12–36–117(1)(p)."

First, respondent argues that the rule is vague as to what conduct is proscribed because the terms "depression," "refractory," and "other treatments" are undefined in the rule.

Terms need not be defined with mathematical precision in order to pass constitutional muster. Instead, the language must be specific enough to give fair warning of the prohibited conduct yet sufficiently general to address the problem under varied circumstances and during changing times. *Eckley v. Colorado Real Estate Commission,* 752 P.2d 68 (Colo.1988).

"Depression" refers to a "sinking of spirits so as to constitute a clinically discernible condition." *Stedman's Medical Dictionary* 416 (25th ed. 1990). "Refractory" is a technical term of art in the medical field meaning "resistant to treatment." *Stedman's Medical Dictionary* 1338 (25th ed. 1990).

The ALJ concluded that the term "other treatments" refers to a reasonable number of other indicated, appropriate, and available treatments. The parties agree that this term does not require a physician to try all other possible treatments before amphetamines may be used.

Accordingly, this rule warns physicians that prescribing a psychostimulant without first determining that the patient's depression is resistant to other indicated, appropriate, and available treatments will subject the physician to disciplinary action. We conclude that this language is specific

enough to give fair warning of the prohibited conduct.

■ Here, respondent diagnosed C.I. as having depression and this diagnosis was not challenged by the Board. Therefore, under this rule C.I.'s condition was "possibly" treatable with stimulants. However, the ALJ found, also with record support, that respondent prescribed Dexedrine as a first line treatment without first determining that C.I.'s depression was resistant to other indicated and available treatments. Thus, respondent's prescribing of Dexedrine to C.I. was proscribed by the amphetamine rule.

Further, insofar as respondent argues that the rule contains no explicit standards for application such that a danger of arbitrary and capricious enforcement exists, we also disagree.

The standard set forth in the rule is that of generally accepted standards of medical practice for prescribing stimulant drugs. Such standard is sufficiently defined to satisfy constitutional requirements. *See Eckley v. Colorado Real Estate Commission, supra* (in a profession in which standards of acceptable practice have developed by custom and tradition over the years, the potential for misunderstanding by the persons regulated or by the enforcing authorities is minimized); *Cooper v. Civil Service Commission,* 43 Colo.App. 258, 604 P.2d 1186 (1979) (if a regulation does not contain specific standards, the certainty required by the Constitution may be provided by the common knowledge of members of the particular vocation).

We conclude that the rule is sufficiently specific to withstand a vagueness attack and that respondent's arguments fail to overcome the presumption of regularity which attaches to administrative regulations. *See Civil Rights Commission v. Travelers, supra.*

### III.

■ We agree with respondent's next contention that the renewing of C.I.'s prescription for Dexedrine was part of a single act of medical practice which did not consti-

tute unprofessional conduct under Colo. Sess.Laws 1979, ch. 108, § 12–36–117(1)(p) at 512, as then in effect.

That provision provided that unprofessional conduct includes:

An act or omission constituting grossly negligent medical practice or *two or more acts or omissions which fail to meet generally accepted standards of medical practice.* (emphasis added)

*Cf.* § 12–36–117(1)(p), C.R.S. (1991 Repl. Vol. 5B) (which contains the additional language "whether the two or more acts or omissions occur during a single treatment of one patient, during the course of treatment of one patient, or during the treatment of more than one patient").

This court interpreted the earlier version of this provision in *People ex rel. McFarlane v. Pfeiffer,* 725 P.2d 19 (Colo.App. 1986). There, we held: "[T]he statute clearly requires multiple acts [of] substandard 'medical practice'.... [An] act of medical practice may subsume within itself a diagnosis, a determination of treatment, as well as the treatment itself [and may] encompass a course of conduct, a process, an engagement in treating a patient."

In *Pfeiffer,* a physician, during the course of a single night, failed to obtain adequate information or to evaluate a patient properly. This resulted in a misdiagnosis and the ordering and administration of improper medication throughout the night. The Board concluded that each administration of medication occurred without adequate information and evaluation and found two or more acts of substandard care. However, this court concluded that the physician's "treatment of the patient during that one night was one continuous sequence of events, a single course of conduct on his part which he undertook in treating the patient."

Here, when C.I. came to respondent concerning her emotional condition, respondent diagnosed her as having moderate depression and determined that treatment with Dexedrine was appropriate. Respondent, without first determining that the depression was refractory to other treatments, began administering this treatment in Jan-

uary 1985 and continued the course of treatment until October 1986, renewing the prescription six times during that treatment period. We conclude that, under *Pfeiffer*, this was a single course of conduct undertaken in treating C.I.'s depression.

The Board contends, however, that this case is readily distinguishable from *Pfeiffer* because the events here are not limited to a single date and because on seven separate occasions respondent assessed C.I.'s condition, determined treatment, and prescribed Dexedrine. We do not agree.

In *Pfeiffer*, although the specific events spanned only one 24-hour period, this fact was not controlling. Rather, the court focused on the meaning of "two or more acts of substandard 'medical practice'" and determined that it referred to more than "two or more administrations of medication within the course of treatment of a *specific medical problem*." *People ex rel. McFarlane v. Pfeiffer, supra* (emphasis added).

Here, respondent was treating a specific medical problem—C.I.'s depression. And as the ALJ found, there was an "initial failure to attempt alternative treatment" for her depression before prescribing Dexedrine. However, contrary to the Board's assertion, his subsequent prescriptions were merely further "administrations of medication within the course of treatment of a specific medical problem" which under *Pfeiffer* was a single act of medical practice. "Where [the] practice complained of is a continuum subsumed within the initial failure to evaluate adequately the patient's condition, it becomes a single act of medical practice." *People ex rel. McFarlane v. Pfeiffer, supra.*

Thus, we agree with the ALJ's conclusion that: "Although Respondent's prescriptions for C.I. were written over a course of approximately one and one-half years, they were part of a single course of conduct or medical practice in relation to his treatment of a single patient for a specific medical problem."

Our resolution of this issue finds additional support in the 1987 amendment which revised this provision to state as follows:

An act or omission constituting grossly negligent medical practice or two or more acts or omissions which fail to meet generally accepted standards of medical practice, *whether the two or more acts or omissions occur during a single treatment of one patient, during the course of treatment of one patient, or during the treatment of more than one patient.*

Section 12–36–117(1)(p) (emphasis added). *See BQP Industries, Inc. v. State Board of Equalization*, 694 P.2d 337 (Colo.App.1984) (subsequent legislative pronouncement of intent may be considered in construing the statute in question).

This amendment, emphasized in the quoted provision, was enacted in direct response to the holding in *Pfeiffer*. During the hearing on the amendment, a representative from the Department of Regulatory Agencies testified that "the [*Pfeiffer*] decision makes it impossible" to sanction a physician for unprofessional conduct under (1)(p) "when only one patient is involved." This amendment will allow the Board to "find two or more acts over the course of treatment of a single patient," whereas under the unrevised provision "you could have a whole series of things that were done wrong to one patient and we have to tell the people when they file a complaint [that] we don't even have jurisdiction, [that we] can't even investigate your complaint [or] issue a letter of reprimand" unless "you find somebody else that the same thing happened to." *See* Hearings on H.B. 1066 before the Committee on Health, Environment, Welfare and Institutions, 56th General Assembly, First Session (January 19, 1987).

In our view, it is readily apparent from the hearing on the amendment that the General Assembly, by adopting the amendment, was changing the provision rather than merely clarifying it. As Representative Irwin, a member of the House committee, stated at the hearing: The amendment would "give the Board the tools with which to raise the level of practice of medicine."

A representative from the Department of Regulatory Agencies further expressed that it would extend the scope of the provision to include "instances of just not meeting the standard of practice, which would be simple negligence." *See* Hearings on H.B. 1066 before the Committee on Health, Environment, Welfare and Institutions, 56th General Assembly, First Session (January 19, 1987); *Colorado Division of Employment v. Parkview Episcopal Hospital,* 725 P.2d 787 (Colo.1986) (when a statute is amended, there is a presumption that there is an intent to change the law).

Thus, under the law in effect at the time and under the circumstances presented here, the prescription renewals were components of a single course of treatment for C.I.'s depression. Accordingly, respondent did not engage in unprofessional conduct pursuant to Colo.Sess.Laws 1979, ch. 108, § 12–36–117(1)(p) at 512, and thus, no sanction was warranted under this provision.

### IV.

Respondent's last contention concerns the Board's determination that respondent engaged in unprofessional conduct in violation of § 12–36–117(1)(g). Specifically, respondent argues that a mere showing of substandard prescribing of a controlled substance is insufficient to prove that respondent prescribed a controlled substance "other than in the course of legitimate professional practice." On the other hand, the Board argues that substandard prescribing of a controlled substance does violate § 12–36–117(1)(g). We agree with the respondent.

A statute should be construed as a whole so as to give consistent, harmonious, and sensible effect to all of its parts and to give effect to the intent of the General Assembly. The court must consider the ends that the statute was designed to accomplish and the consequences which would follow from the alternative constructions. *Adams v. Colorado Department of Social Services,* 824 P.2d 83 (Colo.App.1991).

■ Although the construction of a statute by the agency charged with its enforcement is entitled to deference, courts are not bound by that construction if the result reached by the agency is inconsistent with legislative intent as manifested in the statutory text. *Boulder County Board of Equalization v. M.D.C. Construction Co.,* 830 P.2d 975 (Colo.1992).

"Unprofessional conduct" is defined in § 12–36–117(1)(g) as:

Administering, dispensing, or prescribing [any] controlled substance . . . other than in the course of legitimate professional practice.

At issue is the meaning of the phrase "legitimate professional practice."

"Legitimate" is defined as "according to law; lawful." *Random House Dictionary* 1099 (1987). Thus, legitimate practice is practice that is according to law.

This interpretation conforms to the legislative declaration of purpose in the Medical Practice Act to protect the public from unauthorized, unqualified, and improper practice of medicine. Section 12–36–102, C.R.S. (1991 Repl.Vol. 5B).

■ The Board does not contend that respondent prescribed Dexedrine in the course of unlawful professional practice. Instead, it argues that "legitimate" also means "conforming to recognized principles or accepted rules and standards" and that, thus, any prescribing of controlled substances which fails to meet generally accepted standards of medical practice violates § 12–36–117(1)(g). The Board asserts, therefore, that respondent's substandard prescribing of Dexedrine, although not unlawful, nevertheless constituted illegitimate medical practice. We do not agree.

First, the General Assembly is capable of prohibiting substandard practice in clear and unambiguous language when it wishes to do so, and it has done so specifically in the Medical Practice Act at § 12–36–117(1)(p). *See also* § 12–38–117(1)(f), C.R.S. (1991 Repl.Vol. 5B) (has negligently or willfully practiced nursing in a manner which fails to meet generally accepted standards for such nursing practice); § 12–35–118(1)(j), C.R.S. (1991 Repl.Vol. 5A) (an

act or omission which fails to meet generally accepted standards of dental practice).

Moreover, having defined two or more acts or omissions which fail to meet generally accepted standards of medical practice as grounds for discipline in § 12–36–117(1)(p), it is inconsistent to interpret § 12–36–117(1)(g) as stating that a single substandard act of prescribing a controlled substance constitutes unprofessional conduct.

Furthermore, the amphetamine rule itself, which expands § 12–36–117(1)(p), states that the rule "further [defines] unprofessional conduct, specifically the generally accepted standards of medical practice *regarding prescribing of stimulant drugs.*" (emphasis added) This language suggests that the Board also considers such substandard prescribing properly a subject of § 12–36–117(1)(p).

Accordingly, we conclude that § 12–36–117(1)(p) encompasses all acts of substandard practice, and thus, in order to establish a violation of § 12–36–117(1)(g), it is necessary to prove actions different from or beyond those which are required to establish substandard medical practice. Because the Board proved only that respondent's prescribing of Dexedrine was substandard, it failed to establish any violation of § 12–36–117(1)(g).

Because of our disposition, we need not reach respondent's other contentions.

The Board's order is reversed, and the cause is remanded with directions to dismiss the charges against respondent.

CRISWELL and JONES, JJ., concur.